**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RICHARD JAKIMAS, et al., | ) | |
| | ) | |
| | ) | Civil Action No.: 99-cv-5126 (JLL) |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | **OPINION AND ORDER** |
| HOFFMAN-LA ROCHE, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**LINARES**, District Judge.

This matter is presently before the Court on motions by Defendant Johnson Controls

World Services, Inc., Plaintiff Richard Jakimas and all named Plaintiffs, and Defendant

Hoffman-La Roche, Inc., for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Plaintiffs, all former employees of Hoffman-La Roche, Inc. who were terminated from

employment, commenced this action under § 510 of the Employee Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. § 1140, and the New Jersey Law Against Discrimination,

N.J.S.A. § 10:5-1, et seq. This Court has jurisdiction over the case pursuant to 28 U.S.C. § 1331.

These motions are resolved without oral argument pursuant to Rule 78 of the Federal Rules of

Civil Procedure.

## BACKGROUND

### A.      Factual Background

Defendant Hoffmann-La Roche Inc. ("La Roche") is the United States prescription drug

unit of Roche Group. La Roche maintains its principal place of business in Nutley, New Jersey.

At all relevant times, Defendant Johnson Controls World Services, Inc. ("JCWS") was a

subsidiary of Johnson Controls, Inc. ("JCI"), which is an international company engaged in the business of integrated facility management.[1]  JCI maintains a place of business in the same Nutley, New Jersey facility as La Roche.  This action follows La Roche's decision to outsource certain Technical Services functions to Defendant JCI as of November 4, 1997.  Plaintiffs are approximately ninety-five[2] former employees of La Roche who were terminated on November 3, 1997.  The current Plaintiffs fall into several categories, which include, but are not limited to the following: (1) employees hired by JCI as of November 4, 1997; (2) employees not hired by JCI as of November 4, 1997, some or all of whom chose to retire, seek other employment, or leave the work force; and (3) at least one employee who was on disability at the time of the transition.

All Plaintiffs were employed at La Roche's Nutley, New Jersey industrial complex prior to termination, in various positions within the Technical Services Division.  Plaintiffs were employed as pipefitters, garage mechanics, mailroom clerks, and electricians, in both supervisory and non-supervisory capacities.  La Roche's Technical Services Division included the following departments: Facilities Maintenance, Utility Operations, Engineering, and Site Support Services and included close to 250 employees.

Ray Scherzer ("Scherzer") joined La Roche in the summer of 1996, as the Vice President of the Technical Services Division.  In this capacity, Scherzer had oversight over the entire Technical Services area of the company, including the Nutley and Totowa, New Jersey facilities.

---

[1]Both entities will be collectively referred to as "JCI" for purposes of this motion and for the convenience of the parties.

[2] On May 12, 2005, this Court entered an Order adopting Magistrate Judge Ronald J. Hedges' April 27, 2005 Report and Recommendation, and dismissed fourteen of the original 109 Plaintiffs for failure to provide discovery.  Those former Plaintiffs are Ralph Caso, James Castelli, Joseph DiGiacomo, Lawrence Gelok, Robert Glover, Daniel Green, Richard Hall, Johnny Haddley, Deborah Helfrich, Cheryl Negron, Roger Rotundi, Robert Veleber, Richard Carlson, and Antonio Rizzi.

When Scherzer joined La Roche, the Technical Services Division serviced and maintained the grounds and approximately fifty buildings at La Roche's Nutley and Totowa sites.

Within several months after joining La Roche, Scherzer observed that the infrastructure was in unsatisfactory condition. Scherzer observed repetitive leaks and odors, insulation falling down, and corrosion of structural components. There were also safety concerns, including the improper calibration of safety relief valves and leaking high pressure steam flanges. Additionally, Scherzer found the facilities management processes and practices outdated.

Thereafter, Scherzer began discussions with and sought recommendations from JCI in late 1996. Scherzer was aware of JCI based on his experience with a previous employer. He understood JCI to be an industry leader in providing facilities management services to the pharmaceuticals industry. JCI's customers in this area included Merck, Pfizer, Glaxo-Wellcome, and SmithKline Beecham. Other customers included large banks, IBM, Microsoft, NASA, and the Los Alamos National Laboratory in New Mexico. JCI had been in this business since at least the early 1990s. At the time of the execution of the La Roche-JCI outsourcing agreement, JCI had at least 100 such contracts in place, and at least nine were with pharmaceutical companies.

JCI initially provided Scherzer with a preliminary assessment, described as a "desktop" review or a "Business Case Analysis," comprising a routine overview of how JCI could improve upon the potential client's facilities management operation. This review entailed comparing various operational and financial data to facilities operated by JCI which it considered "best in class." The results of this initial assessment were provided to Scherzer in April of 1997 by Jack O'Connor ("O'Connor"), JCI's principal account representative. As was apparently customary, JCI then offered a more detailed study for a negotiated fee, which encompassed a six-week assessment that would include an intensive on-site investigation.

Between June and August 1997, JCI conducted a functional assessment of the Technical Services group at La Roche's Nutley site.  It submitted its findings and recommendations on August 22, 1997.  On or about September 3, 1997, JCI forwarded a proposed budget and outsourcing arrangement to La Roche.  In or about late September 1997, after internal discussions regarding contract terms, JCI presented La Roche with a proposed "Facilities Management Agreement."  On October 15, 1997, Scherzer attended a meeting with the executive management team at La Roche to advise them of JCI's findings following its detailed evaluation of the La Roche facilities.  At this meeting, Scherzer recommended, and La Roche CEO Patrick Zenner agreed, that La Roche proceed with the outsourcing of the facilities management function to JCI.

On October 20, 1997, La Roche management held a separate meeting with managers and supervisors, and two additional meetings for non-supervisory employees in Technical Services in a La Roche auditorium.  The purpose of the meetings were to announce that the Technical Services functions would be outsourced to JCI.  Attendees also included Scherzer, and La Roche and JCI Human Resources representatives.  There, Scherzer informed the employees that La Roche had decided to outsource Technical Services.  He further explained that on November 4, 1997,  JCI would assume responsibility for maintenance and operations at the Nutley site.  Scherzer also advised that the affected employees that they would have the opportunity to immediately apply for employment with JCI and would most likely be offered positions with JCI.  On October 21, 1997, Scherzer sent out a formal written notification to all employees, including unaffected employees, entitled "Johnson Controls Management Facility Operations and Maintenance."   (Scherzer Decl. Ex. P).

During the period between the initial meeting and November 3, JCI representatives conducted on-site interviews with affected La Roche employees.  As a condition of employment with JCI, JCI required Plaintiffs to sign the following documents: (1) an offer letter, wherein the individual accepted new employment with JCI effective November 4, 1997; (2) an authorization which allowed La Roche to release personnel information to JCI; (3) a "Conditions of Employment" document, listing the conditions of employment with JCI; (4) an acknowledgment form indicating that the new employee read and understood JCI's Employee Safety Guide; (5) an acknowledgment form confirming that each new employee understood JCI's drug-free workplace policy; and (6) an Internal Revenue Service W-4 form for JCI.

On November 3, 1997, Plaintiffs received materials pertaining to La Roche's severance package.  The severance package consisted of two options.  Option I offered two weeks base pay plus an additional week of base pay for each full year of continuous service, pay for vacation earned but not taken, and medical coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1001, et seq., at 102% of the employer's cost or retiree medical coverage, if applicable, at normal retiree contribution fees.  La Roche also offered an enhanced severance package feature, Option II.  Option II offered three months of either free COBRA coverage or retiree medical coverage if eligible, pay for vacation earned but not taken, and additional pay per a schedule that approximated two weeks base pay for each full year on continuous employment.

In order to elect the benefits of Option II, the terminated employees were required to first execute the Acceptance and General Release Form which included, inter alia, a covenant not to sue La Roche.  It released La Roche for claims: (a) arising under ERISA; (b) arising under any state statute "dealing with discrimination in employment," and (c) "relating to any contracts of

employment (express or implied)." (Langon Aff. Ex. G).[3]  La Roche advised the affected

employees that those who chose not to execute the Release would still be entitled to receive the

benefits under Option I.  Under Option II, Roche also provided forty-five days to decide whether

to execute the Release and an additional seven days within which to revoke their acceptance.  All

but one Plaintiff in the instant action executed the Release and received the benefits offered.[4]

## B.    Procedural Background

Plaintiffs commenced the instant action on November 1, 1999.  Plaintiffs filed an

Amended Complaint on August 15, 2003,  alleging violations of: (1) Section § 510 of ERISA;

and (2) the NJLAD.  They charge that La Roche and JCI entered into an employment or

outsourcing agreement with the intention to interfere with Plaintiffs' pension benefits in

violation of § 510 of ERISA.  Plaintiffs maintain that as a result of the agreement, they suffered

a complete or partial loss of pension plan and medical benefits, accrued vacation time or pay,

disability benefits and life insurance.  Plaintiffs further allege that La Roche engaged in age

discrimination in violation of the NJLAD by "selectively terminat[ing] Plaintiffs based upon

their years of service and general age ...."  (Am. Compl. ¶ 38).

In January 2002, La Roche and JCI filed separate motions to dismiss, arguing, inter alia,

that the Complaint was time-barred.   On August 28, 2000, the Honorable Nicolas H. Politan,

U.S.D.J., now-retired, denied the motions to dismiss and instructed the parties to conduct limited

discovery on the issue of when Plaintiffs were given notice of termination.  Defendants were

also ordered to re-brief the issues of statute of limitations and standing to sue.

---

[3]There is also some dispute surrounding whether Plaintiffs signed the Release with the
knowledge that their 401(k) funds were not transferable.

[4]Plaintiffs assert that Plaintiff Martha Skinner did not sign the release and did not receive
severance pay from La Roche.

The matter was thereafter transferred to the Honorable Dennis M. Cavanaugh, U.S.D.J., on September 27, 2000.  After the transfer, a number of motions were filed by the parties.  By Opinion dated May 20, 2002,  Judge Cavanaugh held:

> As previously mentioned, the genuine issues of material fact in dispute concern the core issues in this case.  Primary among these are the five following issues:
>
> 1)    Whether Plaintiffs received adequate and sufficient notification of their termination from La Roche at the October 20, 1997, or the November 3, 1997 meeting ;
> 2)    Whether Plaintiffs were told that their benefits and salaries would be continued without interruption with Johnson Controls such that the transaction would have appeared seamless;
> 3)    Whether Plaintiffs signed the Acceptance and General Release Form with the knowledge that their 401K funds were not transferable or was this information revealed in a later correspondence from La Roche dated July 27, 1998;
> 4)    Whether Defendants intended to maximize the cost effectiveness of their outsourcing agreement by depriving or undercutting benefits to which Plaintiffs' were entitled;
> 5)    Lastly, did the Option Two agreement and subsequent Acceptance and General release form adhere to ERISA guidelines of legally sufficient notification intended to fully inform the employees effected.

(May 20, 2002 Opinion, at 17).  Judge Cavanaugh ruled on the motions as follows: (1) La Roche's motion to dismiss was denied; (2) JCI's renewed motion to dismiss was denied; (3) former Plaintiff, November Third Termination Associations' ("November Third") cross-motion for summary judgment was denied; (4) La Roche's motion for summary judgment was denied; (5) JCI's motion to strike November Third as a party plaintiff was granted; and (6) La Roche's motion to dismiss November Third for lack of standing was granted.  La Roche's subsequent motion for reargument was denied by Judge Cavanaugh, by Opinion and Order of June 21, 2002.

On January 13, 2002, Magistrate Judge Hedges issued an Order denying Plaintiffs' request for leave to amend their Complaint to add Donald Swidrak ("Swidrak") as a Plaintiff on

statute of limitations grounds.  That decision was appealed to this Court.   This Court affirmed by Letter-Opinion and Order dated July 18, 2003.  This Court emphasized that in his October 28, 1997 letter to Al Vinson of La Roche's Human Resources department, Swidrak stated, in relevant part: "On Monday, October 20, 1997, I was informed my employment would be terminated on Monday, November 3, 1997, as a Roche employee."  (Id. at 9).  This Court's ruling was clear that, from Swidrak's October 28, 1997 letter, he had notice of his termination on October 20, 1997.  Consequently, this Court held that Swidrak had actual notice of his termination with La Roche more than two year prior to the commencement of the instant action, and therefore, his claims were outside of the applicable two-year statute of limitations period.

In November 2003, La Roche moved, by way of motion for partial summary judgment, to dismiss the ERISA claims of Plaintiffs Ricki Blohm and Laura Corbo.  JCI joined in the motion, relying on the submissions of La Roche.  On February 26, 2004, this Court held oral argument on the motion.  By Order dated February 26, 2006, this Court denied La Roche's motion on law of case grounds.

Presently, La Roche moves for summary judgment on Plaintiffs' ERISA and NJLAD claims.  La Roche also moves for summary judgment on the affirmative defenses enumerated in La Roche's Answer to Plaintiffs' First Amended Complaint, including: (a) knowing and voluntary waiver of the instant claims by Plaintiffs' signing of releases; (b) the ratification of the releases; and (c) statute of limitations grounds.  Defendant JCI moves for summary judgment on the only claim against it, namely, the ERISA claim.  Plaintiffs move for summary judgment on the substantive claims, as well as the aforementioned affirmative defenses.

# LEGAL STANDARD

## A.      Summary Judgment

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Gleason v. Norwest Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001).  "A 'genuine' issue is one where a reasonable jury, based on the evidence presented, could hold in the movant's favor with regard to that issue."  Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 129 (3d Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).  When considering a motion for summary judgment, all evidence must be reviewed and all inferences drawn therefrom must be in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the moving party files a properly supported motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact.  Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 256.  "The mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."  Id. at 252.  Furthermore, conclusory statements and arguments do not raise triable issues which preclude summary judgment.  Ridgewood Board of Educ. v. N.E., 172 F.3d 238, 252 (3d Cir. 1999).  Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Anderson, 477 U.S. at 257 (citation omitted).  If the opponent fails to make a sufficient showing regarding an essential element of his or her case upon which he or she will bear the burden of

proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. Celotex Corp. v. Catrett, 477 U.S. 317, 321 (1986).

## DISCUSSION

**A.     Statute of Limitations**

Defendants maintain that Plaintiffs' ERISA claims are barred by the applicable statute of limitations.[5]  As a threshold matter, the Court must determine whether the law of the case doctrine bars consideration of the statute of limitations issue.  "Under the law of the case doctrine, once an issue is decided, it will not be relitigated in the same case, except in unusual circumstances."  Hayman Cash Register Co. v. Sarokin, 669 F.2d 162, 165 (3d Cir. 1981).  The doctrine was developed "'to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.'"  Casey v. Planned Parenthood of Southeastern Pa., 14 F.3d 848, 856 (3d Cir. 1994) (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Rules and Practice § 4478 (1981)).  The doctrine of law of the case provides that "when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation."  Resyn Corp. v. United States, 945 F.2d 1279, 1281 (3d Cir. 1991) (quoting Devex Corp. v. General Motors Corp., 857 F.2d 197, 199 (3d Cir. 1988), cert. denied sub nom. Technograph Liquidating Trust v. General Motors Corp., 489 U.S. 1015 (1989)).  Law of the case rules apply "both to issues expressly decided by a court in prior rulings and to issues decided by necessary implication."  Bolden v. Southeastern Pa. Transp. Auth., 21 F.3d 29, 31 (3d Cir. 1994) (citing Doe v. New York City Dep't of Social Servs., 709 F.2d 782 (2d Cir.), cert. denied sub nom. Catholic Home Bureau v. Doe, 464 U.S. 864 (1983)).  "Although it does not limit the power of trial judges from reconsidering issues

---

[5]JCI adopts the facts and arguments set forth by La Roche on the statute of limitations issue. (JCI's Br. in Spp't at 24 n. 11).

previously decided by a predecessor judge from the same court or from a court of coordinate

jurisdiction, it does recognize that as a matter of comity a successor judge should not lightly

overturn decisions of his predecessors in a given case." Fagan v. City of Vineland, 22 F.3d

1283, 1290 (3d Cir. 1994) (citations omitted).

     Turning to the facts at bar, during the February 26, 2004 hearing on La Roche's motion

for partial summary judgment, this Court discussed Judge Cavanaugh's May 2002 ruling, as it

pertained to the statute of limitations issue, stating:

> [T]he issue before me is not whether or not I agree or disagree
> with Judge Cavanaugh.  The question is whether or not the
> issue before me has already been dealt with by Judge
> Cavanaugh.  I understand and acknowledge the argument that
> you make, that perhaps Judge Cavanaugh was not as succinct
> and thorough as you would like in his recitation of the material
> issues of fact that he based his opinion on.  However, he did
> deal with it sufficiently, in my view, the law of the case in this
> matter, and under the circumstances, I have to adhere to it.
> Clearly, this is not a situation where you had made a motion
> for reconsideration before me, but that is not what is involved
> here.

(Hr'g Tr. 25:21 - 26:9, February 26, 2004).  Defendants argue, however, that the law of the case

doctrine does not preclude a court from reconsidering an issue on a fully developed record.

Clearly, the Third Circuit Court of Appeals has recognized "several 'extraordinary

circumstances' that warrant a court's reconsideration of an issue decided earlier in the course of

litigation."  Public Interest Research Group of New Jersey, Inc., v. Magnesium Elektron, Inc.,

123 F.3d 111, 116-17 (3d Cir. 1997) (citations omitted).  Those circumstances include when:

"(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier

decision was clearly erroneous and would create manifest injustice."  Id. at 117.  At the time this

Court heard Defendants' joint motion for partial summary judgment to dismiss the ERISA

claims of Plaintiffs Ricki Blohm and Laura Corbo, such new evidence was not before this Court.

This Court specifically noted:

> I don't think that there is any new evidence now in front of me
> that became available after Judge Cavanaugh dealt with this or
> is there some type of supervening rule of law that renders
> Judge Cavanaugh's position invalid or a situation where I can
> look at it and say, well, notwithstanding his interpretation of
> the documentation that was in front of him, he was clearly
> erroneous in his decision.

(Hr'g Tr. 26:10 - 26:17).

However, there has been additional discovery since this Court's February 2004 ruling, including discovery responses and depositions which relate directly to the issue of the statute of limitations.  As already noted, reconsideration of a previously decided issues be appropriate in certain circumstances, including when the record contains new evidence.  In re City of Philadelphia Litig., 158 F.3d 711, 718 (3d Cir. 1998); Bridge v. United States Parole Comm'n, 981 F.2d 97, 103 (3d Cir.1992).  When new evidence is available, "the question has not really been decided earlier and is posed for the first time."  Hayman, 669 F.2d at 169 (quoting United States v. Wheeler, 256 F.2d 745, 748 (3d Cir.), cert. denied, 358 U.S. 873 (1958)).  The instant case squarely fits the exception based on the availability of new evidence. There was additional discovery directed to all Plaintiffs, completed after this Court's February 2004 rulings.  The discovery bears directly upon the issue of the statute of limitations.  The law of the case doctrine therefore does not prevent this Court from considering the substance of the additional evidence. The previous rulings therefore do not serve as law of the case on this question.

1.      **Commencement of the Limitations Period**

It is undisputed by the parties that a two-year statute of limitations governs Plaintiffs' §

510 claim.  The instant action was commenced by the filing of a Complaint on November 1,

1999.  Any claim which accrued prior to November 1, 1997 would thus be time-barred.

Generally, the statute of limitations period begins to run when the cause of action accrues.

Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 (3d Cir. 1994) (citing Cada v.

Baxter Healthcare Corp., 920 F.2d 446, 450 (7th Cir. 1990)).  Federal law determines when the

cause of action accrues.  Keystone Ins. Co. v. Houghton, 863 F.2d 1125, 1127 (3d Cir. 1988);

Deary v. Three Un-named Police Officers, 746 F.2d 185, 197 n. 16 (3d Cir. 1984).   In federal

court, a claim accrues "as soon as a potential claimant either is aware, or should be aware, of the

existence of and source of an injury."  Oshiver, 38 F.3d at 1386 (citation omitted).  This general

rule of accrual is applicable to ERISA claims. See, e.g., Connors v. Beth Energy Mines, Inc., 920

F.2d 205, 212 (3d Cir. 1990) (applying the general rule and holding that trustees of employee

benefit trust funds should have become aware, in the exercise of reasonable diligence, of their

ERISA claim).  This occurs when a plaintiff "'knows or reasonably should know that the

discriminatory act has occurred.'"  Oshiver, 38 F.3d at 1386 (quoting Ohemeng v. Delaware

State College, 643 F. Supp. 1575, 1580 (D.Del. 1986) (internal citations omitted)).  Furthermore,

as emphasized by the Supreme Court, "'the proper focus is upon the time of the discriminatory

acts, not upon the time at which the consequences of the acts became most painful.'"  Delaware

State College v. Ricks, 449 U.S. 250, 258 (1980) (quoting Abramson v. University of Hawaii,

594 F.2d 202, 209 (9th Cir. 1979)) (emphasis in original).[6]  In light of the forgoing, this Court

---

[6]In its July 13, 2003 Letter-Opinion and Order, this Court held that the Supreme Court's
decisions in Delaware State College v. Ricks and Chardon v. Fernandez, 454 U.S. 6 (1981) (per
curiam), were controlling on the issue of what constitutes notice of termination.  (Id. at 8).

previously held that "the statute of limitations began running on the date the employer provided the employee with notice of the allegedly unlawful decision to terminate ...." (July 13, 2003 Letter-Opinion and Order, at 9).

This Court's present task is to determine when Plaintiffs were aware or should have been aware of La Roche's decision to terminate their employment.

### 2.        Notice of Termination

Initially, this Court finds unpersuasive Plaintiffs' argument that in its July 18, 2003 Letter-Opinion and Order, this Court determined when the Plaintiffs were notified of their terminations. Plaintiffs point to the "Background" section of that Opinion, where this Court stated that "[o]n November 3, 1997, the Plaintiffs were notified that they would be terminated from La Roche and rehired by another company, [JCWS] due to the fact that La Roche and [Johnson Controls] had entered into an outsourcing agreement." (Id. at 2). This statement was not a finding by the Court. Moreover, such a conclusion does not comport with a plain reading of the decision because, as is discussed in detail in the body of the Opinion, Swidrak had actual notified of termination on October 20, 1997.

Turning now to the additional discovery, Defendants contend that the discovery clearly demonstrates that Plaintiffs had notice of La Roche's decision to terminate more than two years prior to the commencement of this action. The record shows that on or about July 28, 2004, Plaintiffs were served with numerous Requests for Admissions. As part of this discovery, each Plaintiff was requested to admit the following:

> 2.        Based upon the information that you received at the aforementioned October 20, 1997 meeting, you understood, at that time, that Roche management had decided that the position which you then held with Roche would be eliminated and staffed by employees of JCI.

      12.     Prior to November 1, 1997, you were aware that the
position that you held with Roche was going to be
eliminated and your employment with Roche terminated.

(Langon Aff. Ex. K).  Thirty seven Plaintiffs admitted to one or both of the aforementioned

questions.[7]  (Langon Aff. Ex. K).  The relevant language contained in these admissions is

strikingly similar to that in Swidrak's October 28, 1997 letter to La Roche's Human Resources

manager.  In his letter, Swidrak stated, in relevant part: "On Monday, October 20, 1997, I was

informed my employment would be terminated on Monday, November 3, 1997, as a Roche

employee."  (Id. at 9).   This Court ruled that "[i]t is clear from the record that La Roche

communicated this decision to Swidrak on October 20, 1997, as evidenced by Swidrak's own

letter to Alvin Vinson [dated] October 28, 1997."  (Id. at 10).  Accordingly, Swidrak's claim

under § 510 of ERISA was deemed futile based on statute of limitations grounds.  Like Swidrak,

these Plaintiffs admit they had actual notice of their terminations prior to November 1, 1997.[8]

---

[7]The Plaintiffs that admitted to one or both of the Requests for Admissions are: Bruce J. Aiello,
Walter Beniuk, Donald Breen, Edward Cabral, Angelo Capalbo, Frank Cavalieri, Peter
Chapman, Charles Delorenzi, Raymond J. Feiner, Andrew Feraco, Raymond Goetz, William J.
Hahn, Ronald Jones, Alojzy Kalata, James F. Kane, Joseph M. Kaprowski, Michael Kennedy,
Edward Kwasnik, William R. Malloy, Sr., Albert A. Marchione, Anthony Mariano, Edward
Mayo, Henry M. McAuliffe, Stephen E. Mellinger, Robert P. Mundt, Joseph M. Orolen, Roger
M. Perri, Frank J. Petrasek, William Pitt, Peter Plafta, Rogue N. Rivera, Chuch L. Rutan, John
Serafin, Robert Shallcross, Anthony J. Spano, and Sara Spano.  (Langon Aff. Ex. K).  Plaintiff
Samuel Rosamilia was served with different Requests for Admissions.  However, like the
aforementioned Plaintiffs, Rosamilia was specifically asked to admit: "Prior to November 1,
1997, you were aware that the position that you held with Roche was going to be eliminated and
your employment with Roche terminated."  (Langon Aff. Ex. M).   He admitted to this Request
for Admissions.  (Id.).

[8]Additionally, this Court notes that Plaintiffs Edward Pajak and Anthony Spera have
acknowledged, through correspondence with La Roche management, they knew about the
outsourcing to JCI prior to November 1, 1997.  Specifically, on October 24, 1997, Pajak sent an
e-mail to Roche management, stating, in relevant part: "Due to the out source of Maintenance,
my 27 years of service will be terminated."  (Langan Aff. Ex. O).  Similarly, on October 21,
1997, Spera wrote an interoffice memo to Roche Human Resources representative, Al Vinson,
which stated, in pertinent part: "As a Roche employee who has been affected by the decision to
(continued...)

As already noted, the statute of limitations "began running on the date [Roche] provided the employee with notice of the alleged unlawful decision to terminate ...." (July 18, 2003 Letter-Opinion and Order, at 9).   These Plaintiffs clearly admit to actual notice of termination prior to November 1, 1997.  Accordingly, their ERISA claims are time-barred.

The Court now turns to whether a reasonable trier of fact could conclude that the remaining Plaintiffs knew or should have known of their terminations with La Roche prior to November 1, 1997.  La Roche specifically charges that those Plaintiffs in attendance at the October 20, 1997 meeting were put on notice of their termination from La Roche.  Defendants further assert that the events following the meeting sufficed to place the absent remaining Plaintiffs on notice outside of the limitations period.  During the October 20 meeting, Scherzer discussed JCI's findings and recommendations pertaining to La Roche's Technical Services area.  Scherzer then, as reflected in prepared remarks, explained to the employees in attendance that La Roche made the decision to outsource the Technical Services functions in which they worked, and discussed the ramifications of that decision.[9]  The prepared remarks state, in relevant part:

So what does this mean to you, and where do we go from here?

---

[8](...continued)
outsource to Johnson Controls, I would like to appeal to you for consideration of retirement. ...I have ten months before I will be eligible for retirement.  Considering the termination which is effective November 3, 1997, I will lose the retirement status that I have worked so hard toward for thirty years." (Langan Aff. Ex. P).  The relevant language in Pajak's e-mail and Spera's memo is virtually indistinguishable from that in Swidrak's October 28, 1997 letter to Human Resources.  Therefore, Pajak and Spera also had actual notice of imminent termination prior to November 1, 1997.

[9]While the remarks were not delivered verbatim, Scherzer has testified that his address "covered all key points ...."  (Langan Aff. Ex. A at 159).

On Tuesday, November 4, you will no longer be Roche employees, and you will receive a severance package from Roche that is based upon your length of service.

In addition, you will have the opportunity for employment with Johnson Controls here in Nutley.  And your new Johnson Controls' compensation and benefits packages will be made as comparable as possible to what you have now.

On November 4, Johnson Controls will assume responsibility for maintaining and operating the Nutley facilities, including employing the workforce that will perform the maintenance and operations.

During the transition period, from today through Monday, November 3, when you will still be Roche employees, you will continue performing your current jobs, reporting to your same supervisors.  By the way, I just finished meeting with your supervisors to talk with them about our decision.

During the transition, people from Johnson Controls will be on site, interviewing each of you, learning more about Roche, and generally working with us to ensure a smooth transition.  I know that you will continue to give them the same high level of cooperation and teamwork that we've been used to.

More details on the transition as well as procedures and reporting relationships after November 3 will be provided later this afternoon by the Johnson people here.

With this improvement plan, we believe we will be able to make a giant leap forward in product, customer service and cost effectiveness.   And by implementing this plan with the help of Johnson Controls, I believe we will move closer to becoming a world-class maintenance and operations organization.

We know that this change in our Technical Services organization may be a very tough one for many of you to accept.  It was a difficult move for Roche and, I might add, a difficult decision for me personally.

> I struggled with this recommendation to outsource our Technical Services because I've enjoyed and appreciated working with each of you. And I sincerely want that good working relationship to continue.
>
> During the transition process over the next two weeks, we will be working hard to treat you all with dignity and respect. ....

(Scherzer Decl. at Ex. O). Scherzer was specifically questioned whether, at the meeting, he advised the employees in attendance that their employment with La Roche would be terminated effective November 3, 1997. He testified:

> Q:   Okay. So the October 20th date then, this was an announcement not of specific termination but of specific outsourcing of different units. And people weren't necessarily told they were terminated on that day, but if they we [sic] still in those units on November 3rd, then they would be terminated, correct?
>
> A:   Oh, no. These people were told that their jobs were over; their jobs would be outsourced; they were Roche employees up to November 3rd; they were Johnson employees on November 4th. So that was - - and that's what we told them.

(Langan Aff. Ex. A at 167:20-168:4). La Roche Human Resources Manager, Alvin Vinson ("Vinson"), who was also in attendance during the meeting, confirms Scherzer's testimony. Vinson testified:

> Q:   During the course of the meeting did Mr. Scherzer tell the employees that their employment with Roche would cease as of November 3, 1997?
>
> A:   Yes.
>
> Q:   Did Mr. Scherzer in your opinion make that clear?
>
> A:   Yes.
>
> Q:   Was there any doubt that it was unclear that individuals in the audience would not be Roche employees as of November 3?

A:      No.

(Langon Aff. Ex. B at 96:25-97:11).  Vinson, who spoke to the employees after Scherzer, further

testified:

Q:      Did you give notification to the employees that they were
        being terminated?

A:      Yes, I was involved in that process.

Q:      Did you say to the employees that they would no longer be
        Roche employees?

A:      Yes, I did.

Q:      You said that?

A:      As part of my notification process during the meeting
        before we transitioned them to the JCI, did I say the exact
        words, employees were notified of their jobs, they would
        no longer by Roche employees, they would be transitioned
        to the JCI group, yes.

(Langon Aff. Ex. B at 46:23 - 47:13).  In view of the foregoing, a reasonable trier of fact would

find that the La Roche employees in attendance during the October 20 meeting were notified of

La Roche's decision to terminate their employment.

        In connection with the October 20 meeting, Plaintiffs were requested to admit the

following:

1.      On October 20, 1997, you attended a meeting that was held
        at the auditorium at Roche's Nutley, New Jersey facilities,
        during which Roche's decision to outsource to Johnson
        Controls certain functions within Roche, including the
        functions of the department in which you worked at the
        time, was announced and discussed by Roche management.

(Langan Aff. Ex. K).  A total of forty seven Plaintiffs admit attending the October 20 meeting.[10]

(Langan Aff. Ex. K).  Two additional Plaintiffs - Richard Jakimas and Louis Ristagno - have

admitted in depositions that they also attended the meeting.  (Langan Aff. Ex. Q at 18:9-25,

19:1-2; Ex. R at 23:19-24:2).  In light of all of the foregoing, these Plaintiffs, as employees in

attendance at the October 20 meeting, were aware or should have been aware of their

terminations with La Roche prior to November 1, 1997.  Their ERISA claims are therefore also

time-barred.

Finally, it appears that a total of nine Plaintiffs deny, in their responses to the Request for

Admissions, that they attended the October 20 meeting.[11]  Notwithstanding their lack of

attendance, this Court finds that the events following the meeting were sufficient, nonetheless, to

place the remaining Plaintiffs on notice of their termination prior to November 1, 1997.  On

October 21, 1997, the day after the meeting, Scherzer sent out to all employees, a formal written

announcement entitled "Johnson Controls management Facility Operations and Maintenance."

(Scherzer Decl. at Ex. P).  It stated, in pertinent part,

---

[10]In response to this Requests for Admissions, twenty five Plaintiffs answered that they admit to
attending the meeting. These Plaintiff are: John M. Adair, John J. Adzima, Bruce Blanchard,
Richard Blohm, Laura Carbo, Paul D. Ciuppa, Paul Day, Peter DeModica III, Stefan Dziaba,
Walter Dziaba, Michael Faron, David Hanrahan, Jan Kasprowski, Flavio Labagnara, Wolciech
Leoszenia, Lawrence Memice, Julian Pokrywa, Ronald Pokrywa, Albert Rybacki, Andrew J.
Saccoccia, Donald D. Smith, Stephen R. Tyburczy, William Villino, Michael A. Vocaturo, and
Marian Wojceichowski.  An additional twenty two Plaintiffs do not deny attending; but indicate
that they lack sufficient knowledge or information.  These Plaintiff are: Thomas Aiello, Gerald
A. Barret, Rene Reis Braga, Samuel Castronovo, Jr., Gary Cocozzo, Alan L. Curtis, Dianne
Flynn, Joseph Gomes, Anthony Greco, Charlene Johnson, Ronald Jones, Robert Kohler, Rosa
Labagnara, Robert J. Lenik, James F. Madigan, Donald Meyer, Nick Nardone, Robert Pavone,
Barbara Robinson, Anthony Spagnuolo, Anthony Spera, Nataie Turano, and Lenoard A. Zummo.
(Langan Aff. Ex. K).

[11]These nine are: Jack Bailey, Tedeusz Bukowski, Paul Franek, Richard Jakimas, Bernard
Kapuscinski, Joseph MacDiarmid, Louis Ristagno, Martha Skinner and John Tomaskovic.
(Langdon Aff. Ex. K).

> For the past several month, as part of a company-wide evaluation of various Roche functions to identify improvement opportunities, we have been conducting a comprehensive analysis of Technical Services.   After careful consideration, we have decided to outsource the following Technical Services functions: Utilities Management; Facilities Maintenance; and Site Support Services, such as Mail Distribution, Corporate Receiving, Custodial Services, Groundskeeping, Laundry and Garage.
>
> Effective November 4, Johnson Controls, a leading provider of facilities operations and maintenance services, will assume responsibility for maintaining and operating the Nutley facilities. Johnson Controls is a highly experienced, high quality organization with more than 16,000 employees around the world. Clients in the pharmaceutical industry include:  American Home Products, Glaxo, Merck, Pfizer, Smithkline Beecham and others.
>
> Johnson Controls has agreed to consider the Roche employees currently performing these functions.  We understand from Johnson Controls that they may have job opportunities for nearly all of our employees who wish to join their firm and that they will begin considering interested employees immediately, so they can be informed prior to November 4.  In addition, all affected Roche employees will be eligible to receive severance under the Hoffman-La Roche Severance Program.

(Id.).  The notice further provided:

> During the transition period, from October 20 to November 3, the affected Technical Services employees will continue to be employed by Roche, performing current duties under current supervision.  At the same time, Johnson Controls representatives will be on-site, interviewing employees and supporting us in ensuring a smooth transition.

(Scherzer Decl. at Ex. P).  Significantly, this notification identified all departments affected by the outsourcing.  It also stated that JCI may have "job opportunities," for those employees who wished to join JCI, and that it "agreed to consider Roche employees currently performing these functions."  (Scherzer Decl. at Ex. P).  Equally important is the fact that the written

announcement also stated that interested employees would be considered for new employment "immediately," so that the employees could be "informed prior to November 4." (Id.).   This clearly demonstrates that La Roche and JCI aimed to facilitate new employment for the affected employees with JCI by the target date of November 3 - the last day when these Technical Services functions would be overseen by La Roche.   The language was clear and unambiguous, and should have apprised a reasonable employee in the affected areas that their employment with La Roche was being terminated.[12]

Over the course of the following two weeks, JCI representatives conducted on-site interviews.   All applicants, as a condition for employment with JCI, were required to execute a number of documents, including a signed offer letter.   The signature of the applicant signaled that they accepted employment with JCI effective November 4, 1997.   As part of the Requests for Admissions served on Plaintiffs on or about July 28, 2004, they were also requested to admit the following:

> 6.      Prior to November 1, 1997, you applied for employment with Johnson Controls.
>
> 8.      Prior to November 1, 1997, you were offered a job by Johnson Controls.
>
> 10.     Prior to November 1, 1997, you signed and delivered (or caused to be delivered) the signed job offer letter to Johnson Controls.
>
> 11.     By signing and delivering the job offer letter, you accepted employment with Johnson Controls.

(Langon Aff. Ex. K).   Of the group of nine Plaintiffs that deny attending the October 20 meeting, Plaintiffs Bukowski, Franek, Jakimas, Kapuscinski, MacDiarmid, Ristagno, Skinner and Tomaskovic admitted that they applied for employment with JCI prior to November 1, 1997, and

_____

[12]Certainly, a reasonable juror could not conclude that an employee who attended the October 20 meeting and thereafter received the October 21 written announcement, did not know or should not have known of their termination with La Roche prior to November 21, 1997.

that they signed and delivered a job offer letter to JCI prior to this date.  (Langon Aff. Ex. K).

Furthermore, Plaintiff Bailey admitted to the last the above-referenced Requests for Admissions,

namely: "By signing and delivering the job offer letter, you accepted employment with Johnson

Controls."  (Langon Aff. Ex. K).[13]  A reasonable factfinder could not find that these Plaintiffs

should not have known of their terminations as La Roche employees prior to November 1, 1997.

In Conclusion, this Court finds that all Plaintiffs, with the exception of Michael

Meecham,[14] knew or should have known of La Roche's decision to terminate their employment

prior to November 1, 1997.  The statute of limitations began to run on their § 510 claims prior to

November 1, 1997, since these Plaintiffs were "aware, or should [have been] aware, of the

existence of and source of an injury."  <u>Oshiver</u>, 38 F.3d at 1386.  As such, their ERISA claims

are now time-barred.  Defendants' motion for summary judgment on the statute of limitations

affirmative defense is therefore granted as to all Plaintiffs with the exception of Plaintiff

Meecham.  Defendants' motion as to that Plaintiff is denied.   Plaintiffs' motion for summary

judgment as to this affirmative defense is therefore denied as to all Plaintiffs with the exception

of Plaintiff Meecham.  Plaintiffs' motion for summary judgment, inasmuch as it based on

Defendants' statute of limitations affirmative defense, is granted as to Plaintiff Meecham.

---

[13]It should also be noted that Bailey indicated a lack of knowledge as to the remaining Requests for Admissions relating to the new employment with JCI.  (Langon Aff. Ex. K).

[14]La Roche acknowledges that Plaintiff Meecham was on disability leave on October 20, 1997, and as such, may not have received notification of his termination until after November 1, 1997. (La Roche's Br. in Opp'n to Pls.' Mtn., at 6 n.5).  Indeed, the record indicates that Meecham did not receive the relevant new employment documents until January 1998.  (Langon Ex. F).  La Roche maintains, however, that Meecham's claims are still subject to dismissal based on the doctrine of ratification and tender-back.

B.      **Release, Tender-Back and Ratification**

1.      **The Release**

La Roche argues that Plaintiffs knowingly and voluntarily waived their federal and state law claims against La Roche, including Plaintiffs' claims under ERISA and the NJLAD, by signing the Release at the time they accepted Option II of the severance package.  It is evident that Judge Cavanaugh's previous ruling pertaining to the Release is law of the case.  In his May 20, 2002 Opinion, Judge Cavanaugh held that there were genuine issues of material fact regarding whether Plaintiffs signed the Release with the knowledge that their 401(k) funds were not transferable.  (Id. at 17).  Defendant cites to no "extraordinary circumstances" that warrant reconsideration on this issue.  Public Interest Research Group, 123 F.3d at 116.  Therefore, this Court denies summary judgment to La Roche insofar as it seeks to bar Plaintiffs' ERISA and NJLAD claims based on the Release.

2.      **Tender-Back and Ratification**

Unlike the issue of the Release, Judge Cavanaugh's May 20, 2002 Opinion never discussed or even mentioned the merits of La Roche's affirmative defense based upon the common law doctrines of tender-back and ratification.  This Court will therefore now consider the merits of this affirmative defense.[15]  La Roche contends that the doctrines of ratification and tender-back, independently bar Plaintiffs' claims.  "The doctrine of contractual ratification is the enforcement of a promise to perform all or part of an antecedent contract of the promisor, previously voidable by him, but not avoided prior to the making of the promise."  Wamsley v.

_____

[15]On January15, 2001, La Roche filed a motion for summary judgment on the ratification and tender-back affirmative defenses.  On September 4, 2003, Judge Hedges signed nunc pro tunc supplemental order, directing the motions be withdrawn without prejudice. La Roche now renews the motion.  (Mtn. in Spp't at 13).

Champlin Ref. and Chems., Inc., 11 F.3d 534, 538 (5th Cir.1993), cert. denied, 115 U.S. 1403

(1995) (citing Restatement (Second) of Contracts § 85 (1981)).  Hence, "when a party ratifies a

voidable contract, he in effect makes a new promise or creates a new legal duty to perform."

Reid v. IBM Corp., 1997 WL 357969, at *10 (S.D.N.Y. June 26, 1997) (citing Wittorf v. Shell

Oil Co., 37 F.3d 1151, 1154 (5th Cir. 1994)).  Under the tender-back requirement, "one who

seeks to avoid the effect of a release must first return or tender the consideration paid him in

connection with his execution of the release."  66 Am. Jur. 2d Release § 45 (West 2006).

"Courts often blur the analysis of issues of ratification and tender because the two doctrines are

interdependent. In order to avoid ratification at common law, the consideration received needed

to be tendered back. To prove ratification, the employer was often required to show that the

releasor had not tendered back the consideration."  N. Jansen Calamita, The Older Worker's

Benefit Protection Act of 1990: The End of Ratification and Tender Back in ADEA Waiver

Cases, 73 B.U. L.Rev. 639, 670 (1993).

    In this matter, La Roche argues that even assuming, arguendo, it intentionally

misinformed Plaintiffs as to material facts in connection with the Release, Plaintiffs have never

tendered back the enhanced severance payments they received for their releases.  Indeed, it is

undisputed that Plaintiffs never tendered back the enhanced severance payments.  (Pls.' Opp'n at

31).

    The Third Circuit has not specifically addressed the applicability of these doctrines in the

context of an ERISA claim.  In Long v. Sears Roebuck, however, the Third Circuit held that the

retention of benefits does not ratify a release of claims under the Age Discrimination in

Employment Act, 29 U.S.C. § 621 et seq., ("ADEA").  105 F.3d 1529, 1529 (3d Cir. 1997).  The

decision was based in large part on the passage of the Older Workers Benefits Protection Act,

("OWBPA"), 29 U.S.C. § 626, which mandated that a release of ADEA claims be knowing and voluntary.  The court noted, that "[t]he language of the OWBPA and its legislative history convince us Congress did not intend that the ratification doctrine be invoked to enforce the terms of a deficient release."  Id. at 1538.  However, the Long court also reasoned that the tender-back doctrine presents practical problems.  The Third Circuit noted that to require tender of the full amount of severance benefits would force an employee to return a sum which would typically include consideration for additional factors which are not being challenged in the case, including, inter alia, rolled-in vacation and sick time.  Id. at 1544.  According to the Long court, this approach "'would appear to leave the employer better off and the employee worse off than they were under the status quo.'"  Id. (quoting Isaacs v. Caterpillar, Inc., 765 F. Supp. 1359, 1372 (C.D. Ill. 1991)).  Additionally, this Court observes that La Roche has not identified any New Jersey decisions that have addressed whether a plaintiff's action is barred as a matter of law because of the failure to tender back monies he received.  Accordingly, this Court holds that Plaintiff Meecham does not have to tender back his severance benefits in order to challenge the release of the ERISA and NJLAD claims.  The Court therefore denies La Roche's motion for summary judgment on the ratification and tender-back affirmative defenses; summary judgment is granted to Plaintiff on these affirmative defenses.

Because Plaintiff Meecham survives summary judgment on the affirmative defenses, the Court will now address the merits of the claims against Defendants.

## C.    ERISA Claims

Plaintiffs allege that La Roche and JCI entered into an employment agreement with the intention to interfere with Plaintiffs' pension benefits in violation of § 510 of ERISA.  Section 510 prohibits "'employers from discharging or harassing their employees in order to keep them

from obtaining [employee] benefits.'" DeWitt v. Penn-Del Directory Corp., 106 F.3d 514, 522

(3d Cir. 1997) (quoting Haberern v. Kaupp Vascular Surgeons Ltd., 24 F.3d 1491, 1501 (3d Cir.

1994)). Section 510 of ERISA, 29 U.S.C. § 1140, provides, in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend,
> expel, discipline, or discriminate against a participant or
> beneficiary for exercising any right to which he is entitled under
> the provisions of an employee benefit plan ... for the purpose of
> interfering with the attainment of any right to which such
> participant may become entitled under the plan ....

Id.  A plaintiff seeking to recover under § 510 need not prove that "'the sole reason for his [or

her] termination was to interfere with pension rights.'"  Gavalik v. Continental Can Co., 812

F.2d 834, 851 (3d Cir.), cert. denied, 484 U.S. 979 (1987) (quoting Titsch v. Reliance Group,

Inc., 548 F.Supp. 983, 985 (S.D.N.Y. 1982), aff'd, 742 F.2d 1441 (2d Cir. 1983)).  However, in

order to recover under § 510, a plaintiff must demonstrate that the defendant had "specific

intent" to violate to violate ERISA.  Id. at 851 (citation omitted); DeWitt, 106 F.3d at 522.  A

plaintiff may use "both direct and circumstantial evidence to establish specific intent, but when

the plaintiff offers no direct evidence that a violation of [§] 510 has occurred, the court applies a

shifting burdens analysis, similar to that applied in Title VII employment discrimination claims."

DiFederico v. Rolm Co., 201 F.3d 200, 205 (3d Cir. 2000) (citing Gavalik, 812 F.2d at 851-53

(applying the McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), shifting burdens

mechanism)).  Under this burden-shifting framework, the plaintiff must first establish a prima

facie case by showing: "(1) prohibited employer conduct (2) taken for the purpose of interfering

(3) with the attainment of any right to which the employee may become entitled."  Gavalik, 812

F.2d at 852 (citation omitted).  If the plaintiff can establish a prima facie case, "the burden then

shifts to the defendant-employer, who must articulate a legitimate, nondiscriminatory reason for

the prohibited conduct." <u>DiFederico</u>, 201 F.3d at 205.  If the employer satisfies this burden, then the plaintiff must show that the employer's non-discriminatory reason is pretextual. <u>Id.</u> (citations omitted).

Guided by these principles, the Court turns to Plaintiffs' claims of discrimination under ERISA.

### 1.      Direct Evidence

La Roche maintains that Plaintiffs cannot point to any direct evidence that it entered into the Facilities Management Agreement with JCI for the specific purpose of avoiding or otherwise interfering with Plaintiffs' pension or retiree benefits.  Direct evidence must "demonstrate that the 'decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" <u>Anderson v. Consolidated Rail Corp.</u>, 297 F.3d 242, 248 (3d Cir. 2002) (quoting <u>Connors v. Chrysler Fin. Corp.</u>, 160 F.3d 971, 976 (3d Cir. 1998)).  Plaintiffs appear to rely on four items as direct evidence of a specific intent to violate ERISA.

The first is an October 14, 1997 e-mail from James Scandura ("Scandura"), Vice President of Operations for JCI, entitled: "Why should JCI assume employees, vs. mgt. only?" (Sciarra Cert. Ex. 29).  Paragraph 2, relied on by Plaintiffs, states: "Experience in hospital industry indicates [management] only projects take significantly longer to implement change. Cost/productivity savings are achieved primarily through slashing headcount, rather than implement [sic] process/quality improvements and cultural change."  (<u>Id.</u>).  The Court is not persuaded by this evidence, since the e-mail simply serves to explain some potential problems associated with management employees in the context of outsourcing.  Scandura testified as follows with regard to this e-mail:

> It refers to a management only contract.  When companies want to do a management only contract they are looking to bring - they are looking to bring in - they are looking to reduce, normally reduce their own cost by eliminating their own headcount.  So in conjunction with these what they do in the hospital environment, which is what this refers to, in the hospital industry what they would do is if they had 50 employees they would come in and say, "Okay, JCI, you manage this and do it with 40 employees."  That's slashing headcount, and that's not how we like to operate.

(Sciarra Cert. Ex. 105 at 127-28).  This Court declines to find that this evidence serves as direct evidence of pension avoidance.

Next, Plaintiffs point to the notes of JCI sales representative, Jack O'Connor, included in a March 4, 1997 document entitled "Strategic Selling Worksheet."   (Sciarra Cert. Ex. 81).  Plaintiffs focus on one reference attributed to Scherzer, namely: "save him lots of money." (Sciarra Cert. Ex. 81 at 4).  This quotation is found under the heading "Prospect/Account Wants & Needs."  (Id.).  There is no indication or suggestion that the reference relates to pension avoidance.  When questioned about this notation, O'Connor testified:

> Q:  So the, "save him lots of money" referred to Ray Scherzer?
>
> A:  Yes.
>
> Q:  Save Ray Scherzer lots of money; correct?
>
> A:  Yes.
>
> Q:  Now the next line says, "Protect the people," and then it says, "Protect the (facility operations people)." Is that what that means?
>
> A:  Yes.
>
> Q:  You know what that meant?
>
> A:  That meant - my recollection that the three top bullets in that column there were the things that Ray wanted out of whatever services we ended up providing him: Save him lots of money, protect the facility operations people and keep the place looking good.

(Sciarra Cert. Ex. 108 at 27:12-28:2).  In view of the foregoing, no reasonable trier of fact would conclude that the reference, "saves lots of money," constitutes direct evidence of specific intent to engage in pension avoidance.

Next, Plaintiffs advance their direct evidence argument by directing the Court to a note handwritten by James Goodwin ("Goodwin") of JCI.  He was part of the JCI team that performed the on-site study of La Roche's Nutley facility.  (Goodwin Aff. at ¶ 3).  In the handwritten note, Goodwin identified "fringe benefits" as an area of "savings."  (Id.).  There is no evidence, however, to suggest that the fringe benefits reference related to pension benefits.  Further, Goodwin stated that he "was not directed to try and find savings in the area of fringe benefits ...."  (Id.  at ¶ 10).  In addition, Goodwin noted that the "[La Roche] pension costs, whether related to a defined benefit plan, a defined contribution plan, or retiree medical costs, were not disclosed to me, nor was I ever directed to ascertain what these costs were, or analyze those particular costs as possible areas of savings."  (Id. at ¶ 10).  This exhibit therefore also fails to serve as direct evidence of pension avoidance.

Finally, Plaintiffs point to alleged inconsistencies in testimony of La Roche and JCI witnesses concerning Scherzer's motivations for seeking the assistance of JCI.  This Court is not convinced that statements by JCI witnesses that Scherzer sought to "improve the quality of services by the facilities management tech services at Roche" are wholly inconsistent with Scherzer's desire to save costs.  (Sciarra Cert. Ex. 108 at 169).  Nevertheless, it is clear that based on the record, Scherzer sought to achieve both by outsourcing with JCI.

To summarize, this Court's review of the record fails to disclose any direct evidence that La Roche entered into the Facilities Management Agreement with JCI for the purpose of engaging in prohibited conduct under ERISA.  Having failed to establish the existence of direct

evidence, the Court must now evaluate whether there is circumstantial evidence of specific intent to engage in prohibited conduct.

### 2. Circumstantial Evidence

As already discussed, the burden-shifting mechanism used in Title VII employment discrimination cases applies to a plaintiff seeking to establish a claim under § 510 through circumstantial evidence. Gavalik, 812 F.2d at 851-53. To establish a prima facie case, a plaintiff must demonstrate: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." Id. at 852. Here, Plaintiffs point to sixteen items which, they contend, constitute circumstantial evidence that Defendants engaged in outsourcing agreement with JCI to avoid pension liabilities.

First, Plaintiffs submit that principals of La Roche and JCI had worked together on prior projects. Plaintiffs also note that Scherzer began planning the outsourcing of his division within months of his arrival at La Roche. The record shows, however, that Scherzer's sole dealing with JCI while previously employed with GlaxoSmithKline was totally unrelated to outsourcing. He states that at the time, his interaction with JCI "related to a major construction project that [he] was overseeing in Great Britain and did not concern any type of outsourcing." (Scherzer Decl. at 5 n.1). This evidence is therefore immaterial to the instant matter. Furthermore, the record shows that Scherzer initially considered outsourcing only as an option. While outsourcing was raised by JCI in early discussions with Scherzer in late 1996 and early 1997, it was only after the evaluation period of approximately ten months that Scherzer recommended that La Roche proceed with the outsourcing. He testified:

> So I spent a lot of time understanding what the outsourcing option
> -how it would be done, what it would look like, how I would
> implement it in case that was the way the company wanted to go.

> So I would have spent a lot of time trying to assess and evaluate
> whether it would have been an effective solution.

(Scherzer Dep. Tr. at 48:2-49:3).  There is no evidence, however, that throughout this evaluation

period, Scherzer had any knowledge or understanding of the impact on La Roche's pension

liabilities.  Accordingly, neither point constitutes sufficient circumstantial evidence of specific

intent to interfere with pension rights.

Next, Plaintiffs point to a JCI marketing brochure which, they assert, describes

outsourcing as a means of "reducing employee liabilities."  In context, the subsection which

included this language, provides:

> Outsourcing is more than a means of achieving focus.  It offers
> numerous advantages, including the oldest means for developing a
> competitive edge -reducing costs.
>
> Today, companies are realizing many in-house services are more
> costly than they previously thought.  Traditionally, management
> has viewed in-house services in terms of the costs directly related
> to labor - benefits and salaries.  This view ignores all
> accompanying costs - administration time, payroll, personnel
> services, retraining, temporary help, insurance, and long-term
> employee liabilities.

(Sciarra Cert. Ex. 26 at 12).  There is nothing in the record, however, to indicate that the

document was viewed on or relied upon by anyone at La Roche.  Plaintiffs further submit that La

Roche executives falsely deny engaging in communications regarding Plaintiffs' pensions during

the transition period, because, according to Plaintiffs, JCI witnesses have further testified that the

executives were present during these discussions.  Even if this is true, there is nothing in the

record to show that pension savings were ever discussed.  Therefore, this evidence also fails to

establish a specific intent to engage in pension avoidance.

Plaintiffs further submit that circumstantial of specific intent to interfere with pension rights exists based on the allegedly conflicting testimony of La Roche executives pertaining to the topic of pensions.  Specifically, Plaintiffs point to the fact that Scherzer testified that La Roche's Vice President of Human Resources, Steve Grossman ("Grossman"), advised that employees would receive pensions from JCI.  Grossman denies this assertion.  La Roche acknowledges that Grossman has testified that he fails to recall being present for any discussions regarding the lack of transition plan at JCI.  (La Roche's Br. in Opp'n to Pls.' Mtn. on ERISA Claims, at 20).  La Roche further acknowledges Scherzer's testimony that he was relying on Grossman and the Human Resources group to advise him on whether JCI's benefits were comparable.  Even if true, the nature of the inconsistencies is too general to create a genuine issue of fact on the issue of specific intent to interfere with benefits.

Plaintiffs also point to the fact that the initial draft contract between the parties included an expense item for Plaintiffs' pensions to be paid by JCI; while a subsequent version deleted the provision.  This Court fails to see how a reference in the original contract to pension costs as one of a number of reimbursable costs supports a claim specific intent to interfere with pension benefits.  Equally as tenuous is Plaintiffs' reliance on the fact that, with the exception of certain managers and supervisors, JCI hired all affected terminated Technical Services employees.

Next, Plaintiffs submit that the former La Roche employees who were outsourced were no longer eligible to participate in a traditional pension plan or receive retiree health benefits, even though they performed the same jobs at the same salary.  There is nothing in the record to indicate that those employees who were retirement-eligible were unable to collect accrued retirement benefits or retiree health benefits.  Additionally, Plaintiffs point out that a JCI Human Resources representative on the transition team, Millicent Pattishall, stated that the reason

former La Roche employee were not offered pensions that were available to the remainder of the company was because the contract between parties was only three years, although the vesting in the JCI benefit program was five years.  (Pls.' R. 56.1 Statement, ¶45).  Plaintiffs note that another JCI employee, Jim Scandura, has testified, however, that a majority of the outsourcing contracts were renewed beyond five years.  (Id. at 46).  There are no facts, however, relating to any discussions with La Roche management pertaining to JCI's contract renewal policy in the context of outsourcing.

Additionally, Plaintiffs contend that La Roche kept a list of the soon to be terminated employees, including how close each employee was to vesting in their pension.  This Court can find no such listing including all this information.  Plaintiffs' Exhibits 17, 18 and 19 include interim revisions of lists of La Roche employees who were to be outsourced.  These exhibits contain specific employee information including employee name, employee ID number, department code, annual pay, job title, grade and date of hire.  (Sciarra Cert. Exs. 17, 18, 19). No reference, however, is made to any vesting dates.  Plaintiff further points to a separate list of supervisors who were to be terminated on October 20, 1997.  (Sciarra Cert. Ex. 15, 16).  Again, no reference is made to vesting dates.  Plaintiffs' reliance on this evidence, therefore, is misplaced.

Plaintiffs' reliance on the October 6, 1997 La Roche Human Resources memorandum entitled "People Close to Retirement" is equally misplaced.  (Sciarra Cert. Ex. 35).  The document makes no mention of vesting; only retirement.  Morever, La Roche represents that each of the employees identified in this memorandum had vested years earlier.  Similarly, Plaintiffs' reliance on the document entitled "List of Vested Employees in Roche Retainment Plan as of 12/31/97" also fails.  (Sciarra Cert. Ex. 38).  La Roche explains that the information

contained therein is taken directly from La Roche's Form 5500 filing with the IRS in connection with the La Roche Retirement plan.  No reasonable juror, therefore, could conclude that La Roche was maintaining a list of employees close to vesting.

Plaintiffs also contend that during the transition, La Roche pursued a goal of achieving savings of forty percent.  The record reveals, however, that at the time in question, La Roche was pursuing a global initiative to reduce the costs of goods sold by forty percent.  A La Roche employee script dated May 15, 1997, contained the following heading as one of the talking points: "Global Initiate: Reduce Costs by 40%," further stating, "[o]ur senior management has set a goal for us to reduce the cost of goods by 40% during the next five years."  (Sciarra Cert. Ex. 48).  Plaintiffs further submit that during the transition period, benefits was the only area analyzed with respect to savings.  This assertion is contradicted by the record, however, including the Business Case Analyses and Facilities Assessment Report.  (Scherzer Decl. Exs. D, F).  Both references, therefore, also fail to serve as sufficient circumstantial evidence of specific intent to interfere with pension benefits to create a genuine issue of fact.

In addition, Plaintiffs submit that had Plaintiffs been able to vest, they would have enjoyed retiree health benefits and additional monthly pension benefits.  Plaintiffs also maintain that most of the terminated Plaintiffs were within a few years months or years from vesting as a La Roche retiree.  It appears that Plaintiffs may be confusing vesting with retirement eligibility, since most of the Plaintiffs were in fact vested.  In any event, this is not circumstantial evidence establishing intent because the record shows that these Plaintiffs were, as a whole, further from retirement than the average La Roche employee, and they had lower average earnings in general and particularly lower when compared to the employees from Technical Services that were retained by La Roche.  La Roche represents that as of January 1997, approximately 2.14% of the

terminated employees were within one year of retirement; by comparison, at the same time, over three percent of the total La Roche population was within one year of retirement.  (Rubino Decl. ¶ 19).  This particular evidence, therefore, also fails to establish a specific intent to interfere with pension rights.

Plaintiffs further point to their expert's identification of over twenty two million dollars in savings to La Roche in pension and other retiree benefits as a result of outsourcing, as circumstantial evidence of pension avoidance.  Their liability expert, Dr. Frank Tinari ("Dr. Tinari"), opined that the "net economic effects upon defendants arising from the Facilities Management Agreement amounts to a net savings of [$22,926,423]."  (Sciarra Cert. Ex. 112 at 2).  As La Roche points out, however, Dr. Tinari analyzed these figures in a vacuum without taking into account the entire financial impact of the outsourcing, such as the approximately seven million dollars paid by La Roche to the terminated employees in severance packages and the costs reimbursed to JCI.  In addition, Dr. Tinari's report assumes that the employees studied would have worked in their pre-termination capacities until retirement at age 65.  This does not take into account that some employees would have separated from the company through resignations, lay-offs, or disability.  As such, this is not sufficient circumstantial evidence of intent to interfere with Plaintiffs' pension rights to create a genuine issue of material fact for trial.

Lastly, Plaintiffs point out that Dr. Tinari has identified future savings for Defendants as a result of future new hires.  While not receiving a pension, future new hires will nevertheless receive benefits such as eligibility to participate in a competitive 401(k) plan.  Moreover, Dr. Tinari's report specifically provides that the analysis did "not consider the net economic savings relating to other individuals who were employed subsequent to the implementation of the

Facilities Management Agreement or will become employed at the Roche facility in Nutley, New Jersey." (Sciarra Cert. Ex. 112 at 11) (emphasis in original). Again, this is not sufficient circumstantial evidence to withstand Defendants' motion for summary judgment.

In sum, this Court finds that the evidence proffered by Plaintiffs as circumstantial evidence, taken together, fails to constitute sufficient evidence to demonstrate that Plaintiffs were terminated with the specific intent to reduce or eliminate their benefits. Based on the record, no reasonable factfinder could conclude that, in outsourcing Plaintiffs' employment, La Roche acted with the specific intent to violate ERISA and avoid its obligations to its employees. Plaintiffs, therefore, fail to make out a <u>prima facie</u> case of a § 510 violation.[16]  Even if Plaintiffs had made out a <u>prima facie</u> case, La Roche has set forth a legitimate nondiscriminatory reason for its decision to outsource various Technical Services functions to JCI.[17]  La Roche therefore meets its burden under the burden-shifting paradigm. Plaintiffs fail, however, to establish that La Roche's stated reasons are pretext. Defendants are therefore granted summary judgment on the ERISA claims as to any remaining Plaintiffs. Plaintiffs' motion for summary judgment on the ERISA claims is therefore denied.

**D.    NJLAD Claims**

Plaintiffs' second cause of action alleges age discrimination against Defendant La Roche in violation of the NJLAD, N.J.S.A. § 10:5-1, <u>et seq</u>.  Plaintiffs, relying on Judge Cavanaugh's May 20, 2002 Opinion, maintain that the NJLAD issue had been "decided on multiple

---

[16]This ruling applies with equal force to Defendant Johnson Controls World Services, Inc. Summary judgment is therefore granted in favor of this Defendant. The Court takes no position, however, on any of the remaining arguments concerning the applicability of ERISA § 510 to this Defendant under the circumstances of this case.

[17]By way of example, an October 17, 1997 memorandum from Scherzer to Grossman summarizes, in ample detail, the "strong technical and financial reasons" for Scherzer's recommendation to outsource to JCI.   (Scherzer Decl. Ex. L).

occasions."  (Pls.' Br. in Opp'n at 39).  In the Opinion upon which Plaintiffs rely, Judge

Cavanaugh discusses the position of the parties on the NJLAD claim, and some of the applicable

standards.  (Id. at 13-14).  The section concludes: "Based upon the foregoing, this Court has

proper jurisdiction over Plaintiffs' federal claims under ERISA and also retains supplemental

jurisdiction over Plaintiffs' NJLAD claims." (Id. at 14).  It is clear to this Court that there was no

decision as to the merits or viability of the NJLAD claim; but rather, simply a pronouncement

that the Court has exercised its supplemental jurisdiction to decide Plaintiffs' NJLAD claims.

The Court therefore turns to the merits of this remaining claim.

　　　　The NJLAD prohibits employers from carrying out hiring or other employment

decisions based on an individual's age, or other discriminatory grounds. The NJLAD provides,

in, relevant part, that:

> It shall be an unlawful employment practice, or, as the case
> may be, an unlawful discrimination:
>
> a. For an employer, because of the ... age, ... of any
> individual ... to refuse to hire or employ or to bar or to
> discharge or require to retire, unless justified by lawful
> considerations other than age, from employment such
> individual or to discriminate against such individual in
> compensation or in terms, conditions or privileges of
> employment ....

N.J.S.A. § 10:5-12.  A plaintiff can prove discrimination through direct evidence; however, that

a plaintiff faces a "high hurdle."  Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir.

1998).  The evidence "must reveal a sufficient discriminatory animus ...."  Anderson, 297 F.3d at

248 (citation omitted).  Circumstantial evidence may also be used to prove discrimination in this

context.  Bergen Commercial Bank v. Sisler, 723 A.2d 944, 954 (N.J. 1999); Greenberg v.

Camden County Voc. & Tech. Sch., 708 A.2d 460, 465 (N.J. Super. Ct. App. Div. 1998).  Under

such circumstances, New Jersey courts have adopted the burden shifting framework established

in McDonnell Douglas. Bergen Commercial Bank v. Sisler, 723 A.2d 944, 954 (N.J. 1999); see

also Abrams v. Lightolier Inc., 50 F.3d 1204, 1212 (3d Cir. 1995) ( "New Jersey courts in

applying the NJLAD generally follow the standards of proof applicable under the federal

discrimination statutes [.]"); Maidenbaum v. Bally's Park Place, 870 F. Supp. 1254, 1258 (D.N.J.

1994), aff'd, 67 F.3d 291 (1995); Giammario v. Trenton Bd. of Educ., 497 A.2d 199, 202 (N.J.

Super. App. Div.), certif. denied, 508 A.2d 212 (N.J. 1985), cert. denied, 475 U.S. 1141 (1986).

If a plaintiff can demonstrate a prima facie case of discrimination, a presumption arises that the

employment decision was motivated by improper considerations. St. Mary's Honor Ctr. v.

Hicks, 509 U.S. 502, 506 (1993); Goodman v. London Metals Exch., Inc., 429 A.2d 341, 347

(N.J. 1981). The burden of production then shifts to the defendant, which must rebut this

presumption by articulating a legitimate, non-discriminatory reason for the adverse employment

action. Hicks, 509 U.S. at 507. Finally, the burden shifts back to the plaintiff to show that the

defendant's proffered reason was merely pretext for age discrimination. Id. at 511; Bray v.

Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997). The New Jersey Supreme Court has

instructed that the trial court should decide the first two stages of the McDonnell Douglas test

and it should not be left for the jury. Mogull v. CB Commercial Real Estate Group, 744 A.2d

1186, 1200 (N.J. 2000) ("Given the confusion that often results when the first and second stages

of the McDonnell Douglas test goes to the jury, we recommend that the court should decide both

those issues.").

    To establish a prima facie case of age discrimination, a plaintiff must establish that he or

she:  "(1) belongs to a protected class, (2) was qualified for the position held, (3) was terminated

despite adequate qualifications, and (4) after termination the position remained open and the

employer continued to seek applications." Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 301

(3d Cir. 2004) (citing <u>Sisler</u>, 723 A.2d at 955); <u>see also</u> <u>Dewees v. RCN Corp.</u>, 883 A.2d 387, 393-94 (N.J. Super. Ct. App. Div. 2005). "Unless a plaintiff is claiming reverse discrimination, it is unnecessary to show a replacement outside of the protected class in order to satisfy the fourth prong of the prima facie case." <u>Dewees</u>, 883 A.2d at 395; <u>see</u> <u>also</u> <u>Wright v. L-3 Communs. Corp.</u>, 227 F. Supp. 2d 293, 296-97, 300 (D.N.J. 2002).

Plaintiffs admittedly rely on few facts to defeat La Roche's motion. They assert that discovery has established "that sixty of the Plaintiffs were between five and ten years from retirement age." (Pls.' Br. in Opp'n at 40; Pls.' R. 56.1 Stmt. ¶ 84). Plaintiffs also contend that the discovery demonstrates that Defendants were tracking the names of the employees close to retirement. (Pls.' Br. in Opp'n at 40; Sciarra Cert. Ex. 35). Plaintiffs contend that these facts alone are more than sufficient to defeat Defendant's motion. The Court notes that these facts do not amount to direct evidence of age discrimination and, at most, may constitute circumstantial evidence. Even if the Court were to assume that Plaintiffs' allegations are accurate, the fact that Plaintiffs' years of service may have played a role in their terminations is not dispositive for purposes of establishing a <u>prima facie</u> case of age discrimination under the NJLAD. There is no evidence that after the Plaintiffs were terminated "the position[s] remained open and the employer continued to seek applications." <u>Monaco</u>, 359 F.3d at 301. Moreover, the Court's review of the extensive exhibits and statements of undisputed material facts has not identified a single piece of evidence that would support the fourth prong. As such, the Court finds that Plaintiffs have failed to establish a <u>prima facie</u> case of age discrimination under the NJLAD. Therefore the analysis under <u>McDonnell Douglas</u> ends here. The second count of Plaintiffs' Amended Complaint is hereby dismissed with prejudice.[18]

---

[18]In light of the Court's conclusion, the Court does not address whether the NJLAD claim is

(continued...)

## CONCLUSION

For the foregoing reasons, it is on this 31st day of March, 2006,

**ORDERED** that Defendant Johnson Controls World Services, Inc.'s motion for summary judgment [Docket # 124] is hereby GRANTED; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment [Docket # 127] with respect to affirmative defenses is GRANTED in part and DENIED in part; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment [Docket # 127] with respect to Plaintiffs' substantive claims is DENIED; and it is

**ORDERED** that Defendant Hoffman-La Roche, Inc.'s motion for summary judgment [Docket # 132] with respect to affirmative defenses is hereby GRANTED in part and DENIED in part; and it is further

**ORDERED** that Defendant Hoffman-La Roche, Inc.'s motion for summary judgment [Docket # 132] with respect to Plaintiffs' substantive claims is hereby GRANTED.

This case is closed.

/s/ Jose L. Linares
_____

DATED: March 31, 2006                    UNITED STATES DISTRICT JUDGE

---

[18](...continued)
preempted by ERISA.