PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
\_\_\_\_\_

No. 06-2399
\_\_\_\_\_

RICHARD JAKIMAS; DIANNE FLYNN,
Association Member;
LOUIS RISTAGNO, Association Member;
ALL OTHER ASSOCIATION MEMBERS;
JOHN M. ADAIR; JOHN J. ADZIMA; BRUCE J. AIELLO;
THOMAS AIELLO; JACK BAILEY;
GERALD A. BARRETT; WALTER BENIUK;
BRUCE BLANCHARD; RENE REIS BRAGA;
TEDEUSZ BUKOWSKI; EDWARD CABRAL;
ANGELO CAPALBO; RICHARD CARLSON;
RALPH CASO; JAMES CASTELLI;
SAMUEL CASTRONOVO, JR.; PETER CHAPMAN;
PAUL D. CIUPPA; GARY COCOZZO; LAURA CARBO;
ALAN L. CURTIS; PAUL DAY; CHARLES DELORENZI;
PETER DEMODICA, III; JOSEPH DIGIACOMO;
STEFAN DZIABA; WALTER DZIABA;
MICHAEL FARON; RAMOND J. FEINER;
ANDREW FERACO; PAUL FRANEK;
LAWRENCE GELOK; ROBERT L. GLOVER;
RAYMOND GOETZ; JOSEPH GOMES;
ANTHONY GRECO; DANIEL GREEN;
JOHNNY HADDLEY; WILLIAM J. HAHN;
RICHARD HALL; DAVID HANRAHAN;
DEBORAH HELFRICH; RONALD JONES;

ALOJZY KALATA; JAMES F. KANE;
JOSEPH M. KAPROWSKI; BERNARD KAPUSCINSKI;
JAN KASPROWICZ; MICHAEL KENNEDY;
ROBERT J. KOHLER; EDWARD KWASNIK;
FLAVIO LABAGNARA; ROSA LABAGNARA;
ROBERT J. LENIK; WOJCIECH LEOZENIA;
JOSEPH MACDIARMID; JAMES F. MADIGAN;
WILLIAM R. MALLOY, SR.; ALBERT A. MARCHIONE;
ANTHONY MARIANO; EDWARD B. MAYO;
HENRY M. MCAULIFFE; MIKE MEECHAN;
STEPHEN E. MELLINGER; LAWRENCE MEMICE;
DONALD A. MEYER; ROBERT P. MUNDT;
NICK NARDONE; CHERYL NEGRON;
JOSEPH M. OROLEN; EDWARD PAJAK;
ROBERT PAVONE; ROGER M. PERRI;
FRANK J. PETRASEK; WILLIAM PITT;
PETER PLAFTA; JULIAN POKRYWA;
RONALD POKRYWA; ROQUE N. RIVERA;
ANTONIO RIZZI; BARBARA ROBINSON;
SAMUEL ROSAMILIA; ROGER ROTONDI;
CHUCK L. RUTAN; ALBERT RYBACKI;
ANDREW J. SACCOCCIA; JAN SERAFIN;
ROBERT SHALLCROSS; MARTHA X. SKINNER;
DONALD D. SMITH; ANTHONY SPAGNUOLO;
ANTHONY J. SPANO; SARA SPANO;
ANTHONY SPERA; NATALE TURANO;
STEPHEN R. TYBURCZY; ROBERT J. VELEBER, JR.;
WILLIAM VILLINO; MICHAEL A. VOCATURO;
MARIAN WOJCIECHOWSKI; LEONARD A. ZUMMO;
RICKI BLOHM; FRANK CAVALIERE;
CHARLENE JOHNSON; DONALD BREEN;

2

JOHN TOMASKOVIC,

Appellants

v.

HOFFMANN-LA ROCHE, INC.;*
JOHNSON CONTROLS WORLD SERVICES, INC.

(*Amended per Clerk's order of June 6, 2006)

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 99-cv-05126)
District Judge:  Honorable Jose L. Linares

_____

Argued February 15, 2007
Before:  SMITH and FISHER, *Circuit Judges*,
and DOWD,* *District Judge*.

(Filed: May 14, 2007)

_____

*The Honorable David D. Dowd, Jr., United States
District Judge for the Northern District of Ohio, sitting by
designation.

3

Charles J. Sciarra (Argued)
Sciarra & Catrambone
1130 Clifton Avenue
Clifton, NJ  07013
     *Attorney for Appellants*

John A. Ridley (Argued)
Drinker, Biddle & Reath
500 Campus Drive
Florham Park, NJ  07932
     *Attorney for Appellee,*
     *Hoffman-La Roche, Inc.*

Dabney D. Ware
Allan P. Clark (Argued)
Foley & Lardner
200 Laura Street
The Greenleaf Building
Jacksonville, FL  32202-0204
     *Attorneys for Appellee,*
     *Johnson Controls World Service, Inc.*

———

## OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

The Appellants, former employees of Hoffman-La Roche Inc. ("Roche"), appeal the District Court's grant of summary judgment in favor of Roche and Johnson Controls World Services, Inc. ("JCI") (collectively "Appellees"),[1] regarding their claims under the Employee Retirement Income Security Act ("ERISA") and the New Jersey Law Against Discrimination ("NJLAD"). Roche asserts the affirmative defenses of a release and tender back/ratification, which were rejected by the District Court, as alternative grounds upon which to affirm the District Court. For the reasons that follow, we will affirm.

**I.**

**A.**

Roche is a prescription drug manufacturer, and JCI is engaged in the business of integrated facility management. The Appellants are approximately ninety-six former employees of Roche who were terminated on November 3, 1997. The Appellants were terminated after Roche decided to outsource some functions of its Technical Services Division to JCI. JCI began managing the outsourced services on November 4, 1997. The majority of the Appellants were hired by JCI in the same position that they held at Roche.

---

[1]Johnson Controls World Services, Inc. was a subsidiary of Johnson Controls, Inc. The parties and the District Court referred to Johnson Controls World Services, Inc. as "JCI" and we use the same acronym.

The circumstances surrounding Roche's decision to outsource are the basis for the Appellants' claims. After becoming Vice President of Roche's Technical Services Division in the summer of 1996, Ray Scherzer ("Scherzer") determined that there were infrastructure problems, and that the practices and processes of the Division were outdated. In late 1996, he contacted JCI and inquired about JCI's facilities management services. JCI first provided Scherzer with a preliminary assessment, which was an overview of how JCI could improve Roche's facilities management operations.

JCI offered to provide a more detailed analysis, which included a six-week on-site assessment of Roche's facilities. This assessment was conducted during June and August of 1997. The findings, recommendations, proposed budget, and information about the proposed outsourcing were provided to Roche in late August and early September of 1997. JCI also submitted a proposed Facilities Management Agreement ("Agreement") to Roche in late September, and Scherzer presented this information to Roche executives on October 15, 1997. Scherzer recommended that Roche accept the Agreement, which would outsource most of the functions of the Technical Services Division to JCI. The Roche executives agreed. Under the Agreement, JCI supplied facilities management services, and Roche reimbursed JCI for its services. Roche agreed to reimburse JCI for labor related costs, other direct costs, and to pay an annual general and administrative fee. JCI also agreed to hire most of the employees Roche terminated due to the outsourcing.

6

On October 20, 1997, Roche held a meeting, at which it informed employees of its decision to outsource some technical services to JCI.[2] Scherzer made the announcement on behalf of Roche, and explained that Roche had decided to outsource the positions in its Technical Services Division to JCI. He stated that JCI would begin managing maintenance on November 4, 1997. Scherzer claims it was made clear that the Appellants' and others' jobs would be terminated on November 3, 1997. The presentation allegedly explained that Roche would be providing severance packages to the affected employees, and that the affected employees would be eligible to work for JCI, with compensation and benefits packages comparable to what they received at Roche. Additionally, Scherzer claims that he informed the audience that the affected employees would remain Roche employees until November 3, but during that time JCI would be interviewing each employee. After Scherzer spoke, a representative from Roche's Human Resources Department spoke, as did representatives from JCI.

A formal written notice was sent company-wide by Scherzer on October 21, 1997, confirming the outsourcing. The letter was addressed to all Roche employees, and explained that Roche had decided to outsource various groups. The letter listed the specific departments being outsourced. It also explained that beginning November 4, 1997, JCI would assume control of those groups, and that JCI had agreed to consider employing all of the current Roche employees in those groups. Further, it explained that until November 3, 1997, the affected employees

_____

[2]A separate meeting was held for supervisors and managers.

7

would continue to be employed by Roche, but that JCI would be on-site to interview them.

The following week, JCI began to interview and make employment offers to the affected Roche employees. As a condition of employment, the prospective JCI employees were required to sign several documents, including (1) an offer letter which stated that the employee accepted employment with JCI commencing on November 4, 1997, (2) an authorization form providing that Roche could release personnel information to JCI, (3) a "Conditions of Employment" pamphlet, (4) a form indicating that the employee received and understood JCI's Employee Safety Guide, (5) a form indicating that the employee was aware of and understood JCI's drug-free workplace policy, and (6) a W-4 form.

Roche provided individual notices to the affected employees on November 3 that stated "[t]his will confirm that the official notification and effective date of the termination of your employment is November 3, 1997." They also received information about Roche's severance package. The severance package provided the affected employees with two options. Option II was an enhanced package, if the employee was willing to sign a release. The release included a covenant not to sue Roche for claims relating to ERISA, state employment discrimination laws, and employment contracts.[3] Even if the

_____

[3]Roche provided the affected employees with forty-five days to decide whether to execute the release under Option II, and an additional seven days in which they could revoke their acceptance.

8

affected employees chose not to sign the release, they were still entitled to the benefits offered in Option I. Only one of the Appellants, Martha Skinner, did not sign the release. All of the Appellants that did sign the release received the benefits to which they were entitled under Option II.

On November 4, 1997, most of the Appellants began working for JCI.[4] The Appellants' jobs were exactly the same at both employers, as were their job titles. The only change, other than that they no longer received pension benefits, was their employer.[5] JCI generally offered its employees 401(k) plans, but an employee was only eligible for such a plan after five years of service. Because the Agreement was only for three

---

[4]At the time the Appellants were terminated by Roche, sixty of them were over age forty-five. Forty-seven of them had between twenty and twenty-four years of service, and fifteen had between fifteen and twenty years of service with Roche.

[5]Roche had both defined benefit and defined contribution plans. The Roche Retirement Plan is a defined benefit plan, to which all contributions were made by Roche. For an employee to be vested under the Roche Plan, they needed five years of service. In order to receive full retirement benefits, the employee needed to reach a set age and have a set number of years of service. If the employee was hired before April 1, 1985, and she/he had ten or more years of service, the employee was eligible for retirement at age fifty. If the employee was hired after April 1, 1985, she/he was eligible for retirement at age fifty-five if she/he had ten or more years of service. Roche also offered its employees 401(k) plans.

9

years, the former Roche employees were not eligible to participate in a 401(k) at JCI.

## B.

The Appellants filed their Complaint on November 1, 1999, in which the November Third Termination Association and three individuals were named as plaintiffs.[6] The Appellees made a motion to strike the Association as a party, and a motion to dismiss the Association's claims because it lacked standing. The District Court granted the motions. The magistrate judge allowed the Appellants to amend their Complaint and add additional individual plaintiffs. However, he did not allow David Swidrak ("Swidrak") to be named as a plaintiff because the judge determined that his claim was time-barred. The determination was based on the fact that Swidrak admitted that he knew of his pending termination on October 20, 1997, as evidenced in a letter he wrote to Roche's Human Resources Department.

The Appellants appealed the magistrate's determination regarding Swidrak to the District Court. They argued that the date of termination, rather than the date of notice began the running of the limitations period. The District Court held that the date of notice is when the statute of limitation begins to run.

_____

[6]In their original Complaint, the Appellants claimed that they received notice of their terminations on October 21, 1997, which was the basis for the motion to dismiss. When the Appellants amended their Complaint, they deleted this portion of the original Complaint.

Its decision was based on *Delaware State College v. Ricks*, 449 U.S. 250 (1980), and *Chardon v. Fernandez*, 454 U.S. 6 (1981) (per curiam). Because the District Court determined that Swidrak received actual notice of his pending termination on October 20, 1997, it affirmed the magistrate's determination that Swidrak's claim was time-barred as the Complaint was not filed until November 1, 1999. Additionally, the District Court refused the Appellants' request that its decision regarding accrual of the claim apply prospectively only.[7]

All of the parties moved for summary judgment in 2005. Roche moved for summary judgment on the Appellants' ERISA and state law claims, and on its affirmative defenses.[8] JCI moved for summary judgment on the ERISA claim, which was the only claim against JCI. The Appellants also moved for summary judgment on the substantive claims, as well as on Roche's affirmative defenses.

---

[7]The Appellants appealed the District Court's determination regarding Swidrak to this Court, and we held that the claim was unripe.

[8]The affirmative defenses were (1) knowing and voluntary waiver by signing the releases, (2) ratification of the releases by failing to return the benefits received, and (3) statute of limitations grounds.

11

The District Court first considered the statute of limitations question.[9]  Because the parties did not dispute that a two-year statute of limitations applied, the District Court was required to determine when the claim began to accrue.  If the statute began to run before November 1, 1997, the claim was time-barred.  The District Court reaffirmed its prior holding that the rule of *Ricks* applies in the context of a § 510 ERISA claim, and therefore the claim accrued when the Appellants received notice of their termination.

The District Court next determined when the Appellants received such notice.  The Appellees served the Appellants with Requests for Admissions in which thirty-seven of the Appellants admitted that they had notice of their termination prior to November 1, 1997.  Two additional Appellants admitted notice prior to November 1, 1997, in correspondence with Roche.  The District Court also determined that sufficient notice was provided at the October 20, 1997 meeting.  Forty-seven of the Appellants admitted attending the meeting by Requests for Admissions, and two Appellants admitted attendance during depositions.  The District Court held that even if the Appellants did not attend the meeting, the October 21, 1997 letter to all employees constituted actual notice of termination.  Additionally, JCI began interviewing and offering jobs to Roche

_____

[9]Even though it had already decided the question, the District Court determined that the law of the case doctrine did not prevent reconsideration of the question because there was new evidence uncovered through discovery.  *See*, *e.g.*, *Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116-17 (3d Cir. 1997).

employees.  Nine of the ten remaining Appellants admit that they applied for employment with JCI before November 1, 1997, and delivered their acceptance letters to JCI before that date.  The District Court determined that the remaining Appellant, Michael Meechan,[10] did not receive notice of his pending termination because he was on disability leave at the time notice was provided.  Accordingly, the District Court granted summary judgment in favor of the Appellees on the statute of limitations defense as to all of the Appellants, except for Meechan.

Because Meechan's claims were not time-barred, the District Court also considered Roche's other affirmative defenses of the release, and tender back/ratification.  Appellant Meechan signed the release, and did not return the consideration Roche provided.  The District Court held that genuine issues of material fact existed as to the validity of the release because it was not clear whether Meechan knew that his 401(k) funds were not transferrable when he signed the release.[11]  Additionally, the

---

[10]The District Court refers to this Appellant as Michael Meecham, but the parties refer to him as Michael Meechan.  We use the parties' spelling of the last name.

[11]Meechan and the other Appellants could not roll over their 401(k) plans with Roche to an outside investment company without serious tax consequences because of an Internal Revenue Code rule.  The rule requires a separation from service in order for an individual to be able to transfer his or her 401(k). It treats the type of transition in this case under the "same desk rule," meaning that there is no separation from service, because

13

District Court determined that Meechan did not have to tender back the consideration for the release in order to bring claims against Roche.

The District Court then reached the claim that Roche and JCI entered into the Agreement in order to interfere with pension benefits in violation of § 510 of ERISA. It held that Meechan failed to prove a prima facie case of specific intent to interfere with pension benefits. Regardless, the District Court determined that Roche articulated legitimate non-discriminatory reasons for its decisions – technical and financial reasons. Meechan failed to prove that these reasons were pretext, and therefore the Appellees' motion for summary judgment on the merits of the ERISA claim was granted.[12] Finally, the District Court also granted summary judgment in favor of Roche as to the state law discrimination claim.[13] It held that there was simply insufficient evidence to prove that Roche terminated Meechan on the basis of age.

The Appellants brought this timely appeal.

———————————

the Appellants continued to perform substantially the same job at substantially the same salary.

[12]The District Court did not reach JCI's argument that it is not a proper party in a § 510 of ERISA claim because the alleged conspiracy claim is not cognizable under the law.

[13]The District Court did not reach Roche's argument that the state law claim was preempted by ERISA.

14

## II.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Our review of a district court's grant of summary judgment is plenary. *NBT Bank Nat'l Ass'n v. First Nat'l Cmty. Bank*, 393 F.3d 404, 409 (3d Cir. 2004). We apply the same standard employed by a district court, and view the facts in the light most favorable to the non-moving party. *Moore v. City of Philadelphia*, 461 F.3d 331, 340 (3d Cir. 2006). However, the non-moving party must present more than a mere scintilla of evidence; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," summary judgment is proper as such a failure "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.

The Appellants claim that the District Court erred by (1) determining that the statute of limitations was triggered when the Appellants received notice of their pending termination, (2) granting summary judgment in favor of Roche and JCI on the § 510 ERISA claim, and (3) granting summary judgment in favor of Roche and JCI on the state law discrimination claim. Roche offers other affirmative defenses, release and tender back/ratification, as alternative bases for affirming the grant of summary judgment. JCI claims that § 510

15

does not allow a conspiracy cause of action, as an alternative theory for the grant of summary judgment. Additionally, Roche also claims that the state law claim was preempted by ERISA.

### A.

The first issue we must address is whether a claim for termination in violation of § 510 of ERISA accrues when the employee is given actual notice of the pending termination or when the employee is actually terminated. As § 510 does not provide a statute of limitations, the statute of limitations is borrowed from state law. *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 843 (3d Cir. 1987). In this case, the parties agree that the applicable statute of limitations under New Jersey law is two years. The question of when the statute began to run, however, is governed by federal common law. *Romero v. Allstate Corp.*, 404 F.3d 212, 221 (3d Cir. 2005). When a claim accrues in the context of a § 510 unlawful termination is a question of first impression for this Court.

In *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129 (7th Cir. 1992), the United States Court of Appeals for the Seventh Circuit addressed this issue. Tolle was informed orally on September 19, 1984, that she would be terminated on October 19, 1984. *Id.* at 1132. A written confirmation of this information was provided to Tolle on September 24, 1984. The court of appeals was asked to consider when Tolle's claim accrued. *Id.* at 1138. The district court determined that the claim arose on September 19 or 24, 1984, when Tolle was informed that she would be terminated. However, Tolle argued that the claim should not accrue until a claim for benefits was

16

denied. *Id.* at 1139. The court of appeals explained that it had to first determine what the alleged unlawful conduct was and when it happened. The next step was to determine when Tolle learned of the injury that resulted from the unlawful act.

The court of appeals in *Tolle* explained that the purpose of § 510 of ERISA was to prevent individuals or entities from interfering with a plan participant's ability to collect benefits to which he or she is entitled or from interfering with such a participant's ability to collect benefits to which he or she may become entitled. Therefore, under § 510, a defendant "can be liable for unlawful interference *before* the participant becomes entitled to benefits under the terms of the plan." *Id.* (emphasis in original). Tolle claimed that her termination was the unlawful conduct because it was allegedly done to avoid paying her benefits, and the court agreed. *Id.* at 1140. The court next considered when the claim accrued. It looked to the Supreme Court's decision in *Ricks* for guidance. The court explained that in *Ricks*, the Supreme Court held that a Title VII claim accrues at the time the employment decision was made, not at the time the injury or consequences of that decision are felt. *Id.* The court of appeals analogized the § 510 claim to intentional employment discrimination cases – it explained that the purpose of § 510, like employment discrimination statutes, is to prevent actions that are taken for an illegal purpose.[14] "[I]t is the illegal decision and the participant's discovery of this decision that dictates accrual." *Id.* at 1140-41. In other words, Tolle's claim

---

[14]It also noted that most courts of appeals apply state employment discrimination or wrongful termination statutes of limitations to § 510 claims for the same reason. *Id.* at 1137-38.

accrued when the employer made its decision and communicated the decision to Tolle. *Id.* Therefore, the court of appeals held that Tolle's claim accrued at the latest on September 24, 1984, when she received the formal notice of her termination. *Id.* at 1141.

We agree with the Seventh Circuit that the accrual rule from *Ricks* should determine accrual in the context of a § 510 claim. *See also Edes v. Verizon Commc'ns, Inc.*, 417 F.3d 133, 139 (1st Cir. 2005) (adopting *Tolle* accrual rule for § 510 termination claims).[15] We are further persuaded that this is the proper time of accrual because of the Supreme Court's decision in *Chardon*. 454 U.S. 6. In *Chardon*, the plaintiffs were "nontenured administrators in the Puerto Rico Department of Education during the 1976-1977 school year." *Id.* at 6-7. Before June 18, 1977, each of the plaintiffs was sent a letter that he would be terminated on a specific date between June 30 and August 8, 1977. The plaintiffs filed their complaint on June 19,

_____

[15]There are cases that seem to use the date of termination as the date that the claim accrued; however, such cases are not clear as to whether notice of the pending termination was provided. *See*, *e.g.*, *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 251 (3d Cir. 2002) (stating parties agreed that plaintiffs were involuntarily terminated in July of 1995); *Musick v. Goodyear Tire & Rubber Co.*, 81 F.3d 136, 137 (11th Cir. 1996) (holding plaintiff's claim was time-barred and apparently using date of layoff as date of accrual); *Heideman v. PFL, Inc.*, 904 F.2d 1262, 1267-68 (8th Cir. 1990) (stating that plaintiffs' claims accrued at the time of termination). Therefore, these cases do not offer much guidance on the issue before us.

18

1978, claiming that their terminations violated § 1983. If *Ricks* applied, the one-year statute of limitations began to run when the plaintiffs received their letters, and therefore their claims were time-barred. The United States Court of Appeals for the First Circuit held that *Ricks* did not apply because the unlawful action in *Ricks* was the denial of tenure while the unlawful action in *Chardon* was termination. *Id.* at 7-8. The Supreme Court reversed the court of appeals and explained that *Ricks* was indistinguishable. It explained that in both cases, the decision was made and the plaintiffs were provided with notice of their eventual termination. *Id.* at 8. The Court explained that advance notice of termination "is a customary and reasonable employment practice which affords the employee an opportunity to find another job." *Id.* n.2. It also reiterated its analysis in *Ricks* that the focus is on the discriminatory act, not when the effects of the act are felt. *Id.* at 8.

> The fact of termination is not itself an illegal act. In *Ricks*, the alleged illegal act was racial discrimination in the tenure decision. Here, [plaintiffs] allege that the decision to terminate was made solely for political reasons, violative of First Amendment rights. There were no other allegations, either in *Ricks* or in these cases, of illegal acts subsequent to the date on which the decisions to terminate were made. As we noted in *Ricks*, "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." In the cases at bar, [plaintiffs] were notified, when they received their letters, that a final decision had

19

been made to terminate their appointments.  The
fact that they were afforded reasonable notice
cannot extend the period within which suit must
be filed.

*Id.* (internal citations omitted).

Based on our adoption of this accrual rule for § 510
claims, we must first determine what constituted the allegedly
unlawful conduct in this case.  Although it could be argued that
the termination is the allegedly illegal act in this case, it is
actually true that the termination itself was not illegal.  Rather,
it is termination with the intent to deprive the Appellants of
future benefit rights that is the allegedly illegal conduct.  There
is no evidence that suggests there was illegal conduct after
Roche made the decision to outsource.  The fact that the
termination was not immediate should not prevent the claim
from accruing.  As the Supreme Court explained in *Chardon*,
employers often provide notice prior to termination.  Such
notice provides an affected employee with the opportunity to
find another job.  This advance notice, which arguably was for
the benefit of the Appellants, should not extend the limitations
period in this case.  Therefore, we hold that when an employee
is terminated in violation of § 510 of ERISA the claim accrues
when the decision to terminate is made and the employee is
informed of the pending termination.[16]

_____

[16]The Appellants assert that a holding that notice, rather
than termination, triggers the statute of limitations ignores the
fact that plaintiffs in this situation could not bring a claim until
they were actually terminated.  However, this argument is

The second-step of the analysis is determining when notice was provided. In this case, the Appellants do not dispute the District Court's findings as to when each of the Appellants received notice. Rather, the Appellants argue that the notice Roche provided was insufficient. As the statute of limitations is two years in this case, and the Complaint was not filed until November 1, 1999, if the Appellants received proper notice prior to November 1, 1997, of their pending terminations, their claims are time-barred. Therefore, we must consider whether Roche provided the Appellants actual notice of their pending terminations.[17]

─────────────────

simply wrong. Section 502(a) of ERISA is the vehicle by which a plaintiff may bring suit for a violation of § 510. *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 143 (1990). Under § 502(a) a plan participant may "enjoin any act or practice which violates any provision . . . ." 29 U.S.C. § 1132(a)(3). Therefore, once an affected employee receives notice that he or she will be terminated, the participant can file for an injunction to prevent the termination if it is due to illegal motives.

[17]In its opinion, the District Court used the language of the discovery rule – whether the Appellants knew or should have known that Roche was terminating them. Although we reach the same result as the District Court, we are not convinced that the use of the discovery rule is appropriate in this context. As discussed above, both *Ricks* and *Tolle* suggest that a claim accrues when the employer decides to terminate the employee and notifies the employee of the decision. These cases could be interpreted as requiring that the employer provide the employee with actual notice of termination. As this question is not

Some of the Appellants admitted either in the Appellees' Requests for Admissions or in correspondence with Roche that they had actual knowledge prior to November 1, 1997, of Roche's decision to terminate their positions. It is clear that such Appellants had actual knowledge of Roche's decision to terminate them. By their own admission, these Appellants' claims are time-barred.

The next group of Appellants are those who attended Roche's October 20, 1997 meeting where the decision to outsource was announced. Some of the remaining Appellants admitted in the Request for Admissions that they attended the meeting and that the decision to outsource the functions of their departments was announced. Other Appellants admitted only that they attended the meeting. The record demonstrates that Scherzer informed the audience that Roche was outsourcing the functions of certain departments to JCI, that he informed the audience that they would remain as Roche employees until November 3, 1997, that they would be eligible for employment with JCI, and that JCI would interview potential employees in the following weeks. A representative from JCI also spoke at the meeting.

Additionally, Roche sent a letter to all employees announcing the outsourcing on October 21, 1997. The letter included all of the departments that would be outsourced, that the affected employees would remain Roche employees until

_____

necessary to our holding, we will assume, without resolving the question, that an employer must provide actual notice to employees to constitute accrual of an ERISA claim.

November 3, 1997, that the affected employees would be eligible for a new position at JCI, and that JCI would be conducting interviews on-site during the following weeks. The letter clearly indicated that employees in the listed departments were losing their jobs with Roche. We find that the information provided at the meeting and the company-wide letter provided actual notice to the Appellants of Roche's decision to terminate their positions.

Another group of Appellants admitted that they applied for employment with JCI, received offer letters from JCI, and signed and delivered the letters to JCI, all prior to November 1, 1997. We also find that this group of Appellants had actual notice prior to November 1, 1997, that their positions at Roche were being terminated.

The only Appellant who did not receive some form of notice is Appellant Meechan. Meechan was on disability leave during the relevant time period and the Appellees concede that he did not receive any form of notice regarding his pending termination until after November 1, 1997. Therefore, all of the Appellants' claims are time-barred, except for Meechan's claims.[18]

_____

[18]The Appellants also claim that a rule that notice triggers the statute of limitations in the context of a § 510 termination case should be applied prospectively only. We see no reason in this case to depart from the general rule of retroactive application. *See*, *e.g.*, *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 95-98 (1993).

23

## B.

The next issue on appeal is whether Roche's other affirmative defenses of the release and tender back/ratification prevent Meechan from bringing his claims. Meechan signed the release and accepted the additional benefits Roche offered under Option II. Therefore, we must determine whether his signing of the release or his failure to return the consideration Roche provided bars him from bringing this suit. The District Court rejected these defenses and we agree.[19]

As to the release, the District Court found that genuine issues of material fact existed as to whether the Appellants knew when they signed the releases that their 401(k) funds were not transferrable. On appeal, Roche does not claim that there are no genuine issues of material fact. In fact, Roche admits that "at the very least, an issue of fact [exists] as to when Appellants first learned of the issue (i.e., before or after they executed the releases and/or the revocation period expired)." Rather, Roche argues that not a single Appellant has explained whether information about the tax consequences would have changed his decision to sign the release. Therefore, Roche claims that this

---

[19]The Appellants claim that we cannot consider these affirmative defenses because Roche did not cross-appeal the District Court's rejection of the defenses. We disagree. It is not necessary for the prevailing party to file a cross-appeal in order to raise arguments to support a district court's judgment on any ground, even one rejected by the district court. *See, e.g.*, *Rite Aid of Pa. v. Houstoun*, 171 F.3d 842, 853 (3d Cir. 1999); *Cospito v. Heckler*, 742 F.2d 72, 79 n.8 (3d Cir. 1984).

is an immaterial issue and we should enforce the releases and dismiss the Appellants' claims.

A release must be made knowingly and voluntarily, *see, e.g.*, *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 522 (3d Cir. 1988), and although a totality of the circumstances test is used to determine the validity of a release, we also consider "whether there is evidence of fraud or undue influence, or whether enforcement of the agreement would be against the public interest." *Id.* at 522-23. Genuine issues of material fact exist as to whether and when the Appellants, specifically Meechan, were informed or misinformed about their ability to roll-over their 401(k)s. Meechan, and all of the Appellants, assert that they would have acted differently had they known of the tax consequences. Therefore, Roche's claim that there is no evidence that the Appellants would have acted differently is without merit. The burden is on Roche, as the party seeking summary judgment, to prove that no genuine issues of material fact exist, and Roche has not met this burden because it admits that such issues exist. Additionally, as the issue of the release is an affirmative defense the burden of proving that it was knowingly accepted is on Roche. *See* Fed. R. Civ. P. 8(c). Roche has failed to meet its burdens and therefore summary judgment was properly denied on this affirmative defense.

Roche asserts that even if we find that the release was invalid, the doctrine of tender back/ratification bars Meechan's claims. The theory of ratification is that a promise can be enforced even though the underlying contract is voidable if it is ratified by the promisor. *See Wasley v. Champlin Refining & Chems.*, 11 F.3d 534, 538 (5th Cir. 1993). This means that the

25

promisor has the power to avoid the contract or to ratify it by making a new one. *Id.* at 538-39. Tender back is a related concept, which provides that if the promisor does not return the consideration received under the contract this is effectively ratification. *See Raczak v. Ameritech Corp.*, 103 F.3d 1257, 1265 (6th Cir. 1997). As noted above, it is undisputed that Meechan has not returned the consideration that he received as severance benefits under Option II. Therefore, we must determine whether the common law principles of tender back/ratification apply to this case. This is an issue of first impression for this Court.

In *Hogue v. Southern R. Co.*, 390 U.S. 516 (1968) (per curiam), the Supreme Court refused to apply the tender back doctrine to a case under the Federal Employees Liability Act ("FELA"). The plaintiff was injured on the job, and signed a release which gave him $105 for his injury. *Id.* at 517. The plaintiff did not return the money before he brought suit. The Court explained that whether tendering back of the consideration before bringing suit was required is a question of federal law. *Id.* The requirement of tendering back consideration is excusable in multiple situations, such as when there is fraud or mutual mistake. The Court reached its decision because it explained that "a rule which required a refund as a prerequisite to institution of suit would be 'wholly incongruous with the general policy of the Act to give railroad employees the right to recover just compensation for injuries negligently inflicted by their employers.'" *Id.* (internal citation omitted). The Court determined that a holding that the consideration paid will be deducted from any award to the injured party was more consistent with the purpose of the Act.

26

In *Long v. Sears Roebuck & Co.*, 105 F.3d 1529 (3d Cir. 1997), we considered tender back and ratification in the context of the Age Discrimination in Employment Act ("ADEA"). *Id.* at 1539-40. Although part of our discussion was based on the Older Workers Benefit Protection Act ("OWBPA"), which amended the ADEA, we also addressed more general issues which are relevant in the context of ERISA. We looked to the decision in *Hogue* for guidance. *Id.* at 1540-41. We noted that "courts have regularly applied the analysis in *Hogue* to reject tender requirements in lawsuits brought under a variety of federal remedial statutes." *Id.* at 1541 (citing cases applying *Hogue* to Title VII, antitrust law, Jones Act, and Sherman Act). We then explained that the ADEA was clearly a "federal remedial statute." *Id.* Because of the purpose of the ADEA – to provide redress for discrimination – we held that the tender back rule should be rejected in suits under the ADEA, as it was for suits under the FELA. We explained that the FELA and the ADEA did not have to be identical in order for the rule in *Hogue* to be extended to the ADEA. "The mandate in *Hogue* is that tender back requirements imposed in connection with the release of federal rights be evaluated in light of the general policy of the statute in question." *Id.*

Additionally, we explained that the *Hogue* Court's concern that a tender back requirement would deter meritorious challenges to releases was also a factor in ADEA claims. Further, decisions enforcing the tender back doctrine have focused on what we called an "incomplete analysis of the equities involved in allowing an employee to retain severance benefits while pursuing ADEA claims." *Id.* at 1542-43. The argument was that allowing an employee to retain the

consideration that was tendered to avoid litigation and bring suit would place the employer in litigation against opponents who may use the consideration to fund the litigation. We recognized the merit of this argument, but rejected it because it ignored the economic reality for most older workers. Congressional findings suggested that many employees needed severance benefits to cover their living expenses, and could not afford to spend it on legal expenses. Further, this was evidence that an employee who has a meritless claim has a "strong financial incentive[] to keep the severance payments rather than risk them in prolonged litigation." *Id.* Rejecting ratification and tender back did not mean that employees would receive a double recovery – severance plus judgment. Rather, if the employer is found liable, the severance benefits will be deducted from any award. *Id.* A requirement that an employee tender back the consideration prior to suit would make it difficult to put the employee in a pre-release position.

The final factor in our decision was the challenges involved in calculating a tender back requirement.

A tender requirement in such cases would create a conundrum as to how much [consideration] should be tendered to restore the pre-release status quo. There is no available method of forcing the parties to agree on what an appropriate amount would be, since typically the employer does not specify how much of the consideration paid to the employee is for the retirement and how much is for the release.

28

*Id.* at 1543-44 (quoting *Isaacs v. Caterpillar, Inc.*, 765 F. Supp. 1359, 1368 (C.D. Ill. 1991)). This confusion as to the amount of consideration to be returned would require "an employee to return a sum that typically incorporates consideration for multiple factors not challenged in an age case: waivers for other violation of law or contract, rolled-in vacation and sick time, and a public relations benefit to the employer that itself may deter other litigation." *Long*, 105 F.2d at 1544. Such an approach, we determined, appears to put the employer in a better position yet leaves the employee in a worse position than they were in under the status quo. Therefore, we determined that it would best serve the purposes of the ADEA to reject the tender requirement.

In *Oubre v. Energy Operations, Inc.*, 522 U.S. 422 (1998), the Supreme Court confirmed that OWBPA displaces the common law doctrine of ratification. Although the case is limited to OWBPA and claims under the ADEA, it offers some guidance for this case. First, the Court rejected the employer's claim that the general rule in contract law is that a plaintiff must tender back benefits received under a contract before bringing suit. *Id.* at 426. There are cases to the contrary, and in equity "a person suing to rescind a contract, as a rule, is not required to restore the consideration at the very outset of the litigation." *Id.* (internal citations omitted). Although the Court determined that OWBPA by its terms indicates that ratification does not apply to ADEA claims, it also noted the effect of ratification on the practical operation of OWBPA. *Id.* at 427. "In many instances a discharged employee likely will have spent the moneys received and will lack the means to tender their return. These realities might tempt employers to risk noncompliance with the

29

OWBPA's waiver provisions, knowing it will be difficult to repay the moneys and relying on ratification." *Id.*

We recognize that other courts have applied the common law doctrine of ratification to ERISA claims. *See, e.g.*, *Deren v. Digital Equip. Co.*, 61 F.3d 1 (1st Cir. 1995); *Wittorf v. Shell Oil Co.*, 37 F.3d 1151 (5th Cir. 1994). However, it does not appear that any courts of appeals have considered the applicability of *Hogue* to ERISA claims. *See Deren*, 61 F.3d at 2 (reserving question of applicability of *Hogue* for another day). We are persuaded the rationales of *Hogue* and *Long* should be applied to ERISA cases.

*Hogue* and *Long* provide strong arguments for the extension of their rule to § 510 of ERISA. ERISA, like the ADEA and the FELA, is a "federal remedial statute." It was "designed to promote the interests of employees and their beneficiaries in employee benefit plans." *DeWitt*, 106 F.3d at 529. The same deterrence concerns exist in this context as well. A plaintiff should not be deterred from bringing a meritorious claim. Additionally, pensions are major assets for most Americans. As Congress recognized "the continued well-being and security of millions of employees and their dependents are directly affected by [pension] plans." 29 U.S.C. § 1001. Therefore, as in *Long*, it is unlikely that an employee would engage in lengthy litigation of a meritless claim which would waste his benefits or severance pay. Additionally, as the Court explained in *Oubre* the application of the doctrine of ratification to ERISA claims may frustrate the practical operation of the protections ERISA affords. It is likely that many employees discharged in violation of § 510 may have spent the moneys

30

they received as severance pay.    Employers could risk
noncompliance with the requirement that a release must be made
knowingly and voluntarily and simply rely on ratification.

The same issues we addressed in *Long* regarding the
amount of money to be tendered back also exist here.    In this
severance package, the employees were provided with severance
as well as pay for unused vacation time.    Therefore, a
determination of exactly what Meechan would have been
required to tender back is unclear and debatable.    The pertinent
justifications for rejecting the application of ratification stated
in *Hogue*, *Long*, and *Oubre*, convince us that tender
back/ratification should also be rejected in the context of § 510.
Therefore, we will affirm the District Court's denial of summary
judgment as to the affirmative defense of tender
back/ratification.

## C.

As Meechan's § 510 claim is still viable, we now reach
the substance of that claim.    Section 510 of ERISA provides in
pertinent part that

> [i]t shall be unlawful for any person to discharge,
> fine, suspend, expel, discipline, or discriminate
> against a participant or beneficiary for exercising
> any right to which he is entitled under the
> provisions of an employee benefit plan, . . ., or for
> the purpose of interfering with the attainment of
> any right to which such participant may become
> entitled under the plan . . . .

31

29 U.S.C. § 1140.  The law in this area is well-settled.

In *Gavalik v. Continental Can Co.*, 812 F.2d 834 (3d Cir.
1987), we outlined the elements of a § 510 claim.[20]   We
explained that a plaintiff does not have to prove that the only
reason that he or she was terminated was an intent to interfere
with pension benefits.  *Id.* at 851.  However, a plaintiff must
"demonstrate that the defendant had the 'specific intent' to
violate ERISA."  *Id.* (quoting *Watkinson v. Great Atl. & Pac.
Tea Co., Inc.*, 585 F. Supp. 879, 893 (E.D. Pa. 1984)).[21]   A
plaintiff must show that "the employer made a conscious
decision to interfere with the employee's attainment of pension
eligibility or additional benefits."  *DiFederico v. Rolm Co.*, 201
F.3d 200, 205 (3d Cir. 2000) (internal quotation marks and

---

[20]In *Gavalik*, the employer created a liability avoidance
program in which it monitored which employees had vested, and
laid off employees who had not vested in an attempt to save
money.  *Id.* at 840-41.  We reversed the district court's grant of
summary judgment in favor of the employer because it was clear
from the record (through direct evidence) that the employer
intended to interfere with the plaintiffs attainment of future
benefits.  *Id.* at 857.

[21]At the same time, actual injury is not required because
the employer does not have to achieve its goals in order to be
liable.  *Id.* at 856.  "Proof of specific intent to interfere with the
attainment of pension eligibility, then, 'regardless of whether the
participant would actually have received the benefits absent the
interference . . .,' will ordinarily constitute a violation of § 510
of ERISA."  *Gavalik*, 812 F.2d at 852 (internal citation omitted).

citation omitted).  Proof that the plaintiff lost benefits because
of termination alone is not enough.  *Gavalik*, 812 F.2d at 851.
Proof that the termination prevented the employee from accruing
additional benefits through more years of service alone is not
probative of intent.  *See Turner v. Schering-Plough Corp.*, 901
F.2d 335, 348 (3d Cir. 1990).  "Where this is the only
deprivation, a prima facie case requires some additional
evidence suggesting that pension interference might have been
the motivating factor.  In this connection, we note that the
savings to the employer resulting from the [employee's]
termination [must be] of sufficient size that they may be
realistically viewed as a motivating factor."  *Id.*  Such proof can
be demonstrated through direct or circumstantial evidence,
because the "smoking gun" evidence may be rare.  *Gavalik*, 812
F.2d at 852.

When there is no direct evidence, courts use a *McDonnell
Douglas-Burdine* type of burden shifting scheme to determine
whether the plaintiffs have proved their case.  *DiFederico*, 201
F.3d at 205.  Plaintiffs must first prove their prima facie case by
showing "'(1) the employer committed prohibited conduct
(2) that was taken for the purpose of interfering (3) with the
attainment of any right to which the employee may become
entitled.'"  *Id.* (quoting *Gavalik*, 812 F.2d at 852).

If the plaintiffs establish their prima facie case, the
burden shifts to the defendant to "articulate a legitimate,
nondiscriminatory reason for the prohibited conduct."  *Id.*  If the
employer satisfies its burden, then the plaintiffs must prove by
a preponderance of the evidence that the reason articulated by
the defendant is merely pretextual.  *Id.*  Once the defendant

33

articulates such a reason, the plaintiffs must meet their "ultimate burden of persuasion." *Id.* at 206 (internal quotation marks and citation omitted). In order to meet this burden, plaintiffs must "either directly . . . persuad[e] the court that the discriminatory reason more likely motivated the employer or indirectly [persuade the court] by showing that the employer's proffered explanation is unworthy of credence." *Id.* (internal quotation marks and citation omitted). The pretext analysis focuses the court's attention on whether the defendant's proffered reason was the real reason for its decision. *Id.*

In this case, Meechan asserts that direct and circumstantial evidence exists. We will first consider the direct evidence. Direct evidence in this context must demonstrate that "decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *See Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 248 (3d Cir. 2002) (internal quotation marks and citation omitted). We have said that this is a "high hurdle" for plaintiffs because direct evidence "must reveal a sufficient discriminatory [or illegal] animus making it unnecessary to rely on any presumption from the prima facie case to shift the burden of production." *Id.* (internal citation omitted).

The direct evidence asserted by Meechan is that (1) there is conflicting testimony by Scherzer regarding the reasons behind the decision to outsource (efficiency vs. savings); (2) there are inconsistencies between the testimony by Scherzer and notes by JCI about whether savings were a consideration in Roche's decision to outsource; (3) there is a note by a JCI employee implying that fringe benefits were an area where

34

money could be saved; and, (4) there is an email from JCI to Roche explaining that savings can be achieved by slashing headcount.

This is simply not direct evidence that the Appellees specifically intended to interfere with pension benefits. There is no "smoking gun" in this case. *See Gavalik*, 812 F.2d at 851. This evidence, even without considering that some of it is taken out of context, does not reveal the requisite intent to engage in proscribed activity such that "it is unnecessary to rely on any presumption from the prima facie case to shift the burden of production." *Anderson*, 297 F.3d at 248 (internal citation omitted). This is generalized evidence and it lacks probative value from which to draw an illegal motive behind Roche's decision to outsource. *See*, *e.g.*, *id.* "Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1992). Meechan has not met this high hurdle of proving specific intent to violate § 510 with direct evidence.

However, as noted above, Meechan also asserts circumstantial evidence, and therefore the burden-shifting analysis applies. Some of the evidence sheds absolutely no light on the question of specific intent. For example, the fact that Scherzer had previously worked with employees of JCI on projects unrelated to outsourcing or the fact that he began thinking about outsourcing shortly after he was hired at Roche are not relevant evidence of specific intent to interfere with pension benefits.

35

Additionally, Meechan relies on his expert's testimony that the outsourcing saved Roche over $22 million in costs for pension and other retiree benefits.  The District Court rejected this testimony because it was flawed.   In reaching this determination, the expert failed to consider any costs that Roche incurred by outsourcing, namely the millions that Roche paid to JCI under the outsourcing Agreement.  Although evidence of substantial cost savings to an employer is persuasive evidence of specific intent, there must be evidence of actual savings. *See*, *e.g.*, *Turner*, 901 F.2d at 348.  Absent the inclusion of the costs to Roche in the calculation, at least in regard to the cost for the Agreement, this is incomplete evidence of the economic consequences to Roche.  Although Roche may have incurred substantial savings as a result of the outsourcing, there is no evidence in the record that demonstrates such savings.  Therefore, we agree with the District Court's rejection of the evidence regarding savings in this context.

However, Meechan has presented other evidence that suggests that Roche had the specific intent to interfere with pension benefits.   The fact that Meechan, and the other Appellants, held the same positions and were paid the same salaries by their new employer, but were no longer entitled to pension benefits, lends support to Meechan's claims that the Appellees intended to avoid the payment of future pension benefits.  This fact alone would not be sufficient to establish a prima facie case, but there is additional evidence.  The record includes some testimony that Roche and JCI discussed pensions and that Roche executives discussed pensions in regard to the outsourcing.  Additionally, the initial draft of the Agreement between Roche and JCI included employee pensions as an

36

expense for JCI, while the final Agreement did not include that provision. This further suggests that there was some dialogue or negotiation regarding pension benefits between JCI and Roche. Therefore, there is some evidence that the Appellees were aware that the outsourcing would interfere with Meechan's pension benefits.

"The burden of establishing a prima facie case is not onerous." *Clark*, 990 F.2d at 1223 (citing *Tx. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1973)). This case falls somewhere between our decisions in *Turner* and *Eichorn*.[22] The

---

[22]In *Turner*, the plaintiff was discharged two and a half years before he would have been eligible for full retirement benefits, and the employer was aware of this effect. *Id.* at 340. Although we found that the plaintiff proved that he was in the protected class and that he was qualified for the position, we determined that there was no evidence that he was discharged in violation of ERISA. *Id.* at 348. The fact that he would be deprived of additional benefits was not sufficient to prove specific intent, especially because the amount of savings to his employer was not of sufficient size to "realistically [be] viewed as a motivating factor." *Id.* We determined that there was no evidence of any economic consequences to the employer due to the termination.

However, in *Eichorn v. AT&T Corp.*, 248 F.3d 131, 150 (3d Cir. 2001), we found that evidence that the employer's policy of not re-hiring for eight months which was very close to the six-month vesting period provided circumstantial evidence that the avoidance of benefits was a motivating factor. There was also a confidential memo from the employer that recognized

evidence includes more than just a showing that the plaintiff was deprived of future pension benefits, but there is no evidence as to the savings to the employer. Since the burden is not onerous, and we must draw all reasonable inferences in favor of Meechan, we hold that Meechan has proved a prima facie case. Therefore, we disagree with the District Court's conclusion to the contrary.

Our analysis does not end, however, as the District Court concluded that even if Meechan proved a prima facie case, the Appellees articulated legitimate nondiscriminatory reasons for the decision, and Meechan failed to prove pretext. We agree with the District Court that the Appellees met their burden of production. Roche's reason for its decision was to improve the quality of the services provided by the Technical Services Division or, as the District Court stated, there was evidence that Roche had strong technical and financial reasons for outsourcing. JCI wanted to obtain the contract with Roche. As this is only a burden of production, the Appellees have met their burden.

The burden shifts back to Meechan. He has to prove by a preponderance of the evidence that the reasons articulated by the Appellees are not credible or that pension avoidance was the

_____

the practical effect of the no hire policy on pension rights. Additionally, there were economic benefits because the defendant was not required to pay for pension benefits. Therefore, we reversed the district court's grant of summary judgment in favor of the employer because we held that the plaintiffs did establish a prima facie case.

38

real motivating or determinative factor.  *See DiFederico*, 201 F.3d at 206-07.  At a minimum, Meechan "must put forward enough evidence to create a genuine issue of material fact as to whether" the proffered reasons were pretextual.  *Kowalski v. L & F Prods.*, 82 F.3d 1283, 1289 (3d Cir. 1996).  This requires Meechan to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action . . . ."  *Id.*

Nothing in the record proves by a preponderance of the evidence that the Appellees' reasons are not credible, nor that the intention to interfere with pension benefits was more likely what motivated the decision to outsource.  Based on the record as it stands, especially without any evidence as to savings to Roche, Meechan has not met his burden.  "A court, like the district court in this case, simply cannot make the unfounded inference that an employer acted with the specific intent to interfere with the plaintiff's attainment of benefits." *DiFederico*, 201 F.3d at 207.  Therefore, we will affirm the District Court's determination that Meechan failed to prove pretext making summary judgment proper in this case.[23]

### D.

The final issue that we must decide on appeal is whether the District Court properly granted summary judgment on Meechan's state law claim under the NJLAD.  The claim is that

---

[23]Our determination that Meechan failed to prove pretext makes it unnecessary for us to decide JCI's claim that § 510 does not allow a conspiracy cause of action.

39

Roche discriminated on the basis of age in making its decision
to outsource. The District Court held that Meechan failed to
prove a prima facie case under the NJLAD and we agree.

Under the New Jersey anti-discrimination law, an
employer cannot discharge an employee because of the
employee's age unless the decision is justified by other lawful
considerations. *See Murray v. Newark Hous. Auth.*, 709 A.2d
340, 344 (N.J. Super. 1998) (quoting N.J.S.A. 10:5-12). New
Jersey uses the *McDonnell Douglas-Burdine* burden-shifting
scheme for discrimination cases. Additionally, the standards
applied to ADEA cases are applied to age claims under the
NJLAD unless there is divergent language between the statutes.
*See Monaco v. American Gen. Assurance Co.*, 359 F.3d 296,
305 (3d Cir. 2004).

In the context of a reduction in force, which is a similar
context to this case, the elements of a prima facie case are
(1) the plaintiff is a member of the protected class, (2) the
plaintiff was laid off from a job that he was qualified for, and (3)
"other, younger, workers were treated more favorably."
*Murray*, 709 A.2d 340 at 344 (internal citations omitted); *see
also Monaco*, 359 F.3d at 304-05.[24]  Direct or circumstantial

[24]The District Court applied an improper prima facie case
standard because it used the prima facie case for a termination
when the position remains open or is filled by someone outside
of the protected class. Because this case deals with outsourcing,
which is essentially the same as a reduction in force, an
employee would never be able to prove that they were replaced
or that the position remained open. Therefore, the prima facie

evidence may be used.  *See Bergen Comm. Bank v. Sisler*, 723
A.2d 944, 953 (N.J. 1999) (citations omitted).  If a plaintiff
establishes a prima facie case, there is an inference of
discrimination.  Then steps two and three are considered.
Ultimately, a plaintiff must prove that age was a determinative
factor in the adverse employment decision.  *Id.*

In *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993), the
Supreme Court held that there is a difference between
discrimination on the basis of age, and an employer's decision
to terminate an employee to prevent the employee from accruing
pension benefits.  *Id.* at 612.  Age and years of service are
"analytically distinct, [and] an employer can take account of one
while ignoring the other, and thus it is incorrect to say that a
decision based on years of service is necessarily 'age based.'"
*Id.*  However, a decision based both on age and pension status
could violate both the ADEA and ERISA.  *Id.* at 612-13.  As
there is no divergent statutory language, this standard applies to
the NJLAD age claim as well.

Meechan has failed to establish his prima facie case.
There is no evidence that Roche treated younger employees
better than older employees – everyone in the Technical
Services Division lost their jobs at Roche.  There is no evidence
that employees in the Technical Services Division were
disproportionately older than employees in other divisions, and
therefore more older workers were terminated because of the
outsourcing.  There is also no evidence that open positions at

---

case for a reduction in force is the proper standard for this type
of case.

41

Roche were provided only to younger employees.  Meechan
bases his claim on essentially the same evidence that he used for
the ERISA claim – he claims that Roche considered his years of
service.    But, even if Roche terminated the Appellants,
specifically Meechan, to avoid paying future pension benefits,
under *Hazen Paper* this does not prove that age was a
determinative factor in Roche's decision.  Absent proof that
younger employees were treated more favorably, Meechan has
not proved his prima facie case.  Therefore, the District Court
properly granted summary judgment in favor of Roche.[25]

IV.

For the reasons stated above, we will affirm the
judgment of the District Court.

---

[25]Our determination that Meechan has failed to prove a
prima facie case under the NJLAD makes it unnecessary for us
to decide whether this claim was preempted by ERISA.

42